David Pound, plaintiff in error *vs.* The State of Georgia, defendant in error.

1. When, upon the trial of an indictment for murder, the Judge admitted evidence of the character of the accused for violence, and also of the deceased for peaceableness, the same not being in rebuttal and objected to by the prisoner:

*Held*, That such ruling was error, under the well established principles of the law of evidence.

2. Where the accused, by his counsel, offered in evidence the testimony of a witness, taken down by the Court in a former trial, and the Court

Pound *vs.* The State of Georgia.

rejected it, except such parts as he decided to be in conflict, characterizing such testimony as heresay:

*Held,* That such testimony, taken down in writing on a former trial, when properly proven, may be offered in evidence by either party to discredit the witness, in whole or in part—in whole, to show the negative of something stated, not testified to on former examination, or in part to contradict the witness, and such evidence may be read to the jury, who will apply it by their memory of what was then sworn to before them, and adjudge the question of its conflict or its materiality, and such application and consideration is a question for the jury under the charge of the Court.

3. When the Court admitted in evidence a particular act of insult, a quarrel between the prisoner and deceased, occurring several months before the homicide, and not connected with the cause occasioning it :

*Held,* That the admission of acts of previous quarrels, of particular acts, to be admissible against the prisoner, must not be a separate, distinct and independent act, but there must be some link of association, something which draws together the preceding and subsequent acts, something which gives color of cause and effect to the transaction, and sheds light upon the motive of the parties, to render such particular act or acts admissible. The state of feeling generally between them may go in evidence to illustrate their conduct at the time.

4. When the Court charged the jury, upon the facts, that the case was without the provisions of section 4266 of the Code, but such section was qualified by the provisions of section 4267 :

*Held,* That the Court erred in the application of section 4267 to the cases provided for by section 4266, as that section is applicable to cases only where, after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another cannot be prevented, it shall be justifiable homicide to kill the person so forcibly attacking and invading the property or habitation of another, and the only justification to that section is: " But it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious personal injury was intended or might accrue to the person, property or family of the person killing."

5. *Held again,* Under this section 4266, construed with the other sections upon the same subject matter, the use of the word person in *the concluding paragraph is to be taken in its connection with habitation, property or family, and, virtually, only such cases as arise when the party is attacked in the manner prescribed in the view of his domicil and in the protection of either person or property connected therewith.

6. When several witnesses were introduced in a case, and the Judge selects one by name, and charges the jury, "If you believe A, then the homicide set out in the indictment is murder :"

VOL. XLIII—6.

Pound *vs.* The State of Georgia.

*Held,* To be error; for it excluded the consideration of the whole case from the jury, and such exclusion involved material questions of fact in the case.

7. When the Court complimented a witness for the prosecution, the mere fact of compliment being certified without giving the language used :

*Held,* That such action by the Court was calculated to give an improper potency to the influence of his testimony, and was not proper in a case involving life.

8. When the fact appeared, upon motion for new trial by the affidavit of the sheriff, that he had, at the request of the jury, brought to them, in their room, loose papers, purporting to be the evidence in the case, not knowing what the papers consisted of, and no exculpatory explanations given :

*Held,* That, in a case of murder, a new trial ought to have been granted upon this ground. For the purity of jury trials, nothing is more to be guarded than the introduction into their rooms of papers relating to the case, without the sanction of the Court. The question is not what material injury they did, but the possibility of injury resulting from an illegal act.

Murder. Criminal Law. Before Judge ANDREWS. Wilkes Superior Court. June, 1870.

On the 25th of February, 1867, Pound killed John E. Harrison, in Hancock county. He was arrested and committed to jail, after a hearing. He was indicted for murder. At October Term, 1867, there was a mis-trial, because the jury could not agree. At the next term, a jury was selected from the grand jurors, by consent, and Pound was again put upon his trial. Another mis-trial was declared, because of the sickness of a juror. By consent, he was again put upon trial, at an Adjourned Term, before a jury taken from grand jurors, and they failing to agree, another mis-trial was declared. By consent, the case was then transferred to Wilkes county, because an impartial jury could not be had in Hancock county. These proceedings were had before Judge Reese.

A copy of the said proceedings having been transmitted to Wilkes Superior Court, Pound was there put upon his trial, in June, 1870.

Pound vs. The State of Georgia.

The evidence adduced on that trial was as follows: The objections made to it, etc., appear hereafter in the motion for new trial, the recitals of which are true. The regularity of the change of venue to Wilkes county was admitted.

First witness sworn for the State—JOHN CARR: Was present when deceased was killed; It was in February, 1867, on road from Sparta to Linton, Hancock county, Georgia, 12th February, 1867; deceased came to school house where witness was at school, to see witness about buying a horse from Mr. Morris; deceased asked witness to walk to deceased's house, about three or four hundred yards; then deceased asked witness to walk to a field where a negro deceased had hired was cutting logs; when he started he said he would take his axe to help the negro cut, if necessary; negro was nearly done cutting, and deceased asked witness to walk over into a field across the road with him to see if there were any logs over there; when they left negro, heard a gun fire; in crossing the field over the fence, witness heard a second gun fire; witness told deceased he was going down there and see what they were shooting at; in walking across the field a rabbit jumped up, and witness heard Pounds say to his children to put a good load in the gun and bring it to him, (Pound); witness then saw it was his (witness') father's hog he was shooting at; witness then told Harrison he would see if Pound would kill the hog; after Pound got the gun he got in the lane and started the hog up towards the road; Pound drove hog to back of garden, and his son and daughter went round to front of Pound's horse lot in the road, went through the yard, when they met; Pound loaded another barrel of his gun. [Diagram shown to the jury.] When witness and deceased reached back of Pound's lot, deceased found his fence down, and asked witness to help put it up; witness at that time had deceased's axe; while putting up fence Pound went back in lane and commenced cursing witness; witness first came opposite accused, near furthest end of the lane from road, Pound being in his corn field,

and deceased in his with witness; neither said anything to Pound at that place, after loading two barrels; lane seven or eight feet wide where they were putting up fence; Pound told witness his d——d old hog had torn down his fence, and got in his field, and cut his hog all to pieces; witness asked if he could help what his hog did when witness was not there? Pound said witness *had* been calling him a coward, and saying he would not fight, and if witness did not believe he would fight, to come over and try him; witness replied he had nothing to fight him with; accused called witness d——d dog soup and maggot soup, and other unpleasant things; accused then stepped on a log in mouth of lane; his daughter then stepped up by him; his daughter said something to Pound which witness did not understand; Pound came up to the road to front of where they were putting up fence; all fence at that time but last rail was up; deceased had just picked up the rail when Pound cursed him; called deceased a d——d something—witness does not remember what, and deceased told him he would not take it; Pound then told deceased to come over, and deceased stopped to set rail up to his left side; Pound then presented his gun at Harrison, and then took his gun up across his left breast for a few seconds; then Pound presented it at Harrison again and fired.    When the gun fired, deceased stepped one foot backwards and said, " Oh, Lord, I'm killed;" Pound then presented gun at witness, and witness got behind a stump, and turning saw Pound still had gun presented at him.  Witness then went home and carried the axe with him, and started after a doctor; went in his house and got his father's pistol out of the desk, and carried it with him; Mr. Morris, witness' mother and Mrs. Duggin, then went up to where the homicide took place; witness had no weapon but pocket knife; had on vest, and about like he is now; Harrison had no weapon, witness thinks, and had on no coat, only pants and shirt; Harrison carried axe to field, but witness took it, and had axe when difficulty occurred, and witness carried

axe immediately to his father's house, about one mile distant.

*Cross-Examined:* At the time Pound was cursing him, witness told Pound he had nothing to fight him with; Pound asked witness if he would fight him at any other time and place, or in any way, and witness replied that he would; Pound had double-barrel shot gun, worth about $8 00 or $10 00; witness says diagram shown is correct; deceased and accused were about six or seven feet apart when the shooting occurred, and deceased was about three feet from fence, on Harrison's side; muzzle of gun was about two and a half or three feet from deceased when he was shot; lane between fields was about a quarter of a mile long; shooting of Harrison occurred about eight or nine panels of fence from mouth of the lane; found Pound shooting hog about one hundred yards from other end of the lane; after Pound left the log where he had been with his daughter, he continued cursing witness until he got where they were; witness does not think he cursed Harrison but one time; witness was then about twenty years old; Harrison was about twenty or twenty-one; Harrison and Pound had been acquainted nearly all their lives; Harrison had lived about a mile and a half, or two miles below Pound the year before, and was at the time of the shooting living about one half or three-quarters of a mile from Pound; Harrison was killed about sun-down; witness has been sworn in this case three or four times, and once in addition before the coroner's inquest; thinks he was also sworn before a magistrate; he thinks he was sworn at October Term, 1867, Hancock Superior Court—is not positive; thinks he was sworn at April Term, 1868; thinks he was sworn at May adjourned Term, 1868—is not certain; witness thinks he has not stated before on oath that Harrison said on the evening of the killing that he was taking the axe along to help the negro cut logs, if he found his help necessary to enable the negro to finish the field that evening; witness, upon being further interro-

gated, says, he don't know but what he has; remembers to have heard his testimony in this case commented upon in the Court-house before ; witness does not think he heard his testimony commented on as being improbable in this: that it was unreasonable for Harrison to be at that hour of the evening carrying his axe to the field to cut logs; witness and Harrison were over half way from road to where Pound was when the rabbit jumped up; this is the place where he first heard Pound tell his children to load the gun, where he discovered it was his father's hog Pound was after, and where he said he would go and see if Pound would kill the hog ; he went to see about the hog, and Harrison went with him ; after witness took the axe he kept the axe in his hand all the while; helped put up the fence—did not put down the axe while helping ; there were but few rails thrown off the fence on the ground; when Pound accused witness of having called him a coward, witness asked him who told him so ? Pound said he could prove it by good authority; do not remember that he denied having called Pound a coward ; do not know but what he testified before that he asked Pound who told him this ; Pound accused witness of having killed his dog; doesn't think he owned or denied it; doesn't know whether he killed his dog; last time he saw the dog he was running; don't remember that Pound called Harrison a damned meddlesome rascal; don't remember what he said further than cursing him; don't remember that Pound warned Harrison if he got over the fence he would kill him; don't think he told him so ; witness don't think he has stated this in any previous testimony; witness says if he did he may not have intended it, or interrogator may have misunderstood him ; when Harrison told Pound, in response to his cursing, that he wouldn't take it, he started towards the fence and stopped ; was not putting the rail on the fence when he said this—had not got to it; Harrison was putting up the fence about the time Pound was loading his gun in the road ; witness says he omitted on direct examination to state that

Pound drew back his gun as if he was going to strike him; witness has said Harrison started towards fence with a rail and stopped; witness don't know that he has any impression that Harrison was going to the fence with any intention to put it up; don't think he had any idea of getting over the fence; witness can't tell what he thought at that time was Harrison's motive in going towards the fence; witness don't remember whether it was a full length rail or not; thinks it was long enough to go on the panel; Harrison never put the rail on the fence; when deceased fell he thinks the rail fell right across the fence, one end lodging on the fence; thinks the rail fell across deceased—won't be positive about it; when the rail fell, witness thinks the lower end of it remained on Harrison's left side; the upper end, he thinks, fell over towards Harrison's right side; thinks deceased picked up the rail just before or just as Pound cursed him; when deceased first picked up rail he did so as if he was going to put it on the fence, and not as if he was going to strike Pound; deceased had the rail in this same position until he put it down by his side; witness doesn't know that he thought at the time whether he was going to strike Pound; witness don't know but what he has testified before that Harrison had the rail in a position as if he intended to strike Pound; witness and deceased were in a moderate walk when they walked through the field where they were when they first saw Pound; when witness and deceased went towards where Pound was, his son and daughter were the only members of Pound's family with him; don't remember that he saw his wife or any other of his family but the said son and daughter; don't remember testifying on any previous examination that Mrs. Pound told him, (witness,) to go off; witness saw nothing to indicate that Pound's family came out as if they expected a difficulty; thinks he stated in a previous testifying that deceased stepped a foot back; witness don't know that he has ever heard any comments upon the possibility of accounting for the body of deceased being as far from the fence as it was

found; when witness said he would go and see if Pound would kill the hog, deceased said he would go too to see if there were any logs down there; didn't say he would go to see if it was his, (Harrison's,) hog; Harrison saw the hog; deceased didn't go to see if it was hog; when deceased and witness first went to where the negro was cutting, witness went because Harrison asked him to go with him; witness had no purpose of his own in going; witness says he has not testified before that he went to the field to look for sheep there; there were sheep there, one sick, and they found the sick sheep; witness says he testified about the sheep at one time; he doesn't know that he did every time he has been sworn; witness doesn't know that he has testified at any time that the sole reason he or deceased had for going to the field was to look for logs; he doesn't remember exactly whether he ever gave in his testimony this way or not; witness says Harrison didn't pick up rail with both hands as if he intended to strike Pound across the fence; witness thinks he testified at October Term, 1867, that Harrison took the rail in both hands, as if he intended to hit Pound across the fence; this was after Pound cursed him; it was after deceased said he wouldn't take that, (referring to the cursing); witness don't think he said on this examination that when Harrison said he wouldn't take that, he immediately put the rail down by his left side, and remained standing with it there until he was shot; witness supposes he and Pound were on bad terms before this difficulty; don't know whether deceased and accused were, but adds, "I believe too they were;" witness says Harrison said he spoke to Pound and he would not speak to him; witness does not think he has testified once there was no bad feeling between accused and witness; witness never testified that he and Pound were friendly; witness states that Pound's son told him to go away from there.

*Re-Direct:* Saw Pound's dog once after he saw him running; it was between his father's house and the branch; wit-

Pound *vs*. The State of Georgia.

ness says the dog was drawn out of his father's well after that; witness didn't see him drawn out himself; negro boy cutting logs was between one-fourth and one-half mile from Harrison's house; these logs were between seventy-five and one hundred yards from where Harrison was killed; witness says his impression is that he merely saw the rail in the act of falling across Harrison; Harrison, when shot, fell right back.

Dr. W. H. GREEN, sworn : *Direct*: Witness was not called to see Harrison the evening he was shot; didn't see him until twenty-four hours after deceased; was in his house when he first saw him; witness examined wound; it was one and a half inches above right nipple, inclined downwards, backwards and obliquely to the left; it had on the flesh evidences of powder; when witness saw it, it had been bleeding profusely, and was, at the time, still oozing a little; the wound, he supposes, was about one inch, irregularly, in diameter, bearing marks of being a gunshot wound; didn't see the shot, but supposes they were double B's, or perhaps larger—not larger than small buckshot; witness was, at that time, and is now, a practicing physician, and his medical opinion is, deceased died from the wound; doesn't know the exact angle, but thinks it was at an angle of about forty-five degrees when the body was erect; striking the skin or bone very frequently deflects the ball; the balls passed probably between the ribs without breaking either; witness probed the wound; has known accused about fifteen or sixteen years.

*Cross-Examined:* Witness thinks some of the shot changed direction after striking the body, but only such as struck a rib; all the shot had the same range until they struck the bones; those that struck rib were even more vertical than those that did not—that is, they glanced after striking the ribs; witness says the lower part of the rib being thinner than the upper, would have been broken, had not the shot come from an angle of forty or forty-five degrees; a load, with as large shot as that, discharged horizontally, would

probably have broken a bone larger than the lower surface of the rib; the place where the wound was, in the lung, was very near the root of the right lung; that part of the lung is very little changed in location by death; witness thinks he got the correct range of the shot, from his examination, and he was examining with a view to get the range; witness does not think the wound could have been given with the range it had if both parties—the one shooting and the one shot— had been standing erect; thinks it impossible, at the distance the parties were apart; if Harrison had been on the fence, leaning over, that would have been a complete explanation of the wound, and of the direction the balls took after entering the body of Harrison; witness examined fence where it was said the body lay; saw powder marks on the top rail; the rail was rather triangular; the powder mark was on the side of the rail next to where Pound is said to have stood; the powder spot on the rail was somewhat in the shape of a half-moon, the convex side, towards the lane, five or six inches in diameter; witness thinks if Harrison had been with his breast resting on the top rail, and his body leaning over, this position would have fully explained the powder marks witness saw; witness has experimented with a shot-gun, with reference to this case, and this opinion with regard to the powder marks on the body is the result of such experiments; the fence was not exceeding five feet high, witness does not suppose; thinks it would strike about or below his chin; witness is a little over six feet high; the lower part of the rib is thin compared with the other part; witness thinks even smaller shot than these would have carried away the lower part of the rib if the gun had been horizontal when shot; doesn't think, from his experiments, that the muzzle of the gun, when shot, could have been more than two feet from the body; knew Harrison about one and a half years; was not a large man; about one hundred and fifty pounds in weight; about five feet, six or eight inches high; was an active man, witness thinks; from an examination, am satisfied Pound's

leg has been broken; limps sometimes; this was his condition before killing Harrison; can't say when Pound's leg was broken; has seen Pound get along very well on it.

*Re-Direct:* The doctrine of the medical books is that a ball frequently is deflected when it strikes the skin or other hard substance; a wind sometimes deflects a ball; Harrison's lungs, when examined, were not inflated—partly collapsed, and partly filled with blood; thinks the death was within a few seconds after the shot; thinks a shot from a gun, within two feet of an erect body, would throw the body backwards; witness thinks if the body had been against the rail, a shot from a gun, with the muzzle two feet off, might possibly have thrown the body three feet back; does not recollect whether, on a previous examination, he said such a shot, when instantaneous death ensued, would cause the body to fall down when it was on one side or other of the fence; does not think the wound could have been inflicted at that angle by shooting over the fence, Harrison being erect; witness says it is recognized as true by his profession that the direction a ball takes in a body is no certain criterion of the direction in which the ball entered, but it is further laid down, that a ball, going with great velocity, generally continues in the same direction as that from which it entered; there is an instance in the books of when a Frenchman was shot in the neck, and the ball ranged round and came out at the same hole where it entered; and another, where a man in battle was shot in the sternum, and the ball was found in the scrotum; witness' opinion is, that it is impossible that the ball could have taken a range of forty-five degrees, if both parties had been standing erect, and at the distance apart that they were; witness thinks the range of the shot could have been accounted for by supposing that Harrison, being two or three feet from the fence, endeavoring to screen himself behind the fence, and was in the act of stooping when shot; the lane at this point was about eight feet wide, as far as witness' acquaintance goes; deceased was a peaceful, quiet and industri-

ous man; witness never knew of deceased having a fight; knew deceased about eighteen months before his death; was a young man, about twenty-one or twenty-two years old; of his own knowledge, witness knows little or nothing of defendant's character for violence.

By DEFENSE: Witness don't know whether deceased was a high-spirited man; never suspected him of being a cowardly man.

By THE STATE: From the distance at which the parties are represented to have been apart, Pound also being represented to have been three or three and a half feet from the fence, witness does not think deceased could have been on the fence, as the powder would have burnt the flesh more than it was burned.

By DEFENSE: Knows nothing of the position of the parties, except from the evidence of the witnesses preceding him; if deceased had been on fence and the muzzle two feet from him, this position would fully explain the range, powder marks, and all other signs the witness discovered; wood, from experiment, scorched ot twelve to eighteen inches; cloth also at twelve inches.

Next witness by State—JAMES V. M. MORRIS: Witness saw deceased's body soon after he was killed; was at Green B. Carr's 12th February, 1867, at six o'clock, P. M.; John Carr came and stated to witness that Pound had shot Harrison, and desired witness to go to him while Carr went for the doctor; Green B. Carr and witness immediately started to the place, and when they got there, Harrison's wife and Mrs. Duggin were there; found Mr. Harrison lying on his back, his left hand by his side, and his right hand lying over behind his head; his hat was about three feet from his head, immediately behind him; Harrison was dead when witness reached there; his forehead was cold and his body warm when witness reached him; his feet were about three feet from the fence; those present determined to carry the body to the house, and all left but witness; witness remained about half-

hour and examined the place, position of the body, and took particular notice of the distance from the fence of the body; examined the wound; witness thought it was large enough to admit his two fingers, but did not put them in the wound; there was powder smoke on Harrison's shirt all around the wound; the wound had not bled at all more than would naturally flow from breaking the skin; only one drop of blood on the ground next morning, and that came from his (deceased) mouth; witness noticed that night a rail leaning over against the fence where he was shot; he supposed the rail had been leant there; body was moved to deceased's house that night, about one-fourth or one-half mile distant; next morning witness returned to the spot, after breakfast, with other gentlemen; examined next morning and saw no signs about the place where killing occurred to show that deceased had ever struggled; measured from where deceased's head lay, five feet, eight inches towards the fence, at which place witness supposes deceased's feet lay; supposes five feet, eight inches to have been his height; from where witness supposed deceased's feet lay to the fence, witness found, by measurement, to be three feet; discovered powder spot on top rail, about midway the panel; walked to the fence to examine powder spot; fence was about four feet eight inches high; witness measured it by his body; in examining powder spot, witness found it on outside of the rail from the field in which Harrison lay; powder spot was narrow towards the lane and widened towards the field; no smoke on either side of rail—only on top; witness also saw, on the third or fourth rail from bottom, that a little piece of the rail was knocked off and was lying on the ground; witness then went back to the house, and there saw coroner's examination and Dr. Green's examination; the wound was about two inches above right nipple; saw Dr. Green probe the wound; when Green remarked he thought the angle about forty-five degrees, witness, at the time, did not think the angle so great, though he said nothing; this judgment based upon observing the angle of

Pound *vs.* The State of Georgia.

the probe; turned Harrison over and his back was all bloodshot, and witness left, and saw no more of him; witness' opinion at the time was that the angle of the range was not more than thirty or thirty-five degrees; witness was at one time a house carpenter, accustomed to describing angles; saw nothing else on ground when he got to where body was; is satisfied there was no axe there—knows he would have seen one, had it been there; examined the premises well; body was left where found, lying about an hour, and then removed to Mr. Harrison's house; witness examined powder spot in the shirt; hole was in the centre of the powder spot; edges of the hole in shirt looked as if they might have been scorched; the powder spot extended some space over the shirt; witness doesn't know exactly how large the powder spot was; rail, witness thinks, was about four or five inches through; rail seemed to have been taken from outside of a tree; powder spot was on the top of the rail, the rail lying on the fence.

*Cross-Examination:* Powder spots on shirt and rail had no well defined shape; the rail was lying to right of where deceased's body had lain, one end on the ground, the other resting on the fence; there were no indentations on the rail.

*Re-Direct:* Witness knew deceased about twelve months; deceased was teacher in Sabbath-school the year before and at the time of his death; never heard a word against him. Witness' knowledge of the man, Harrison, was a clever man, peaceable and quiet; and witness don't know if he was to say he was a religious man that he would go beyond his knowledge of the man; in conversation, day of killing, deceased talked as a pious man would, and bore himself as a pious man, so far as witness' knowledge extended; witness knows nothing of Pound's violent character; never heard Pound use a profane word in his life.

By DEFENSE: Witness thinks Harrison was a brave man; thinks he would not have hesitated to resent an insult.

By THE STATE: Opinion of witness is, deceased would

avoid a difficulty; had conversation with deceased the day of the killing; deceased, in speaking of the differences between him and Pound, said he had no unkind feelings towards Pound, wished to have no difficulty, and wished to be friendly with him, as they were neighbors; this was about three hours before the killing; witness spent about three hours with Harrison that day; in this conversation, Harrison stated that he had spoken to Mr. Pound and Pound refused to speak to him; Harrison was shot over the eighth pannel of the fence, along the lane, from the public road.

Next witness by the State, JAMES McRAE: Didn't accompany Mr. Morris on either visit to rail; saw the rail about sunset the next day after killing; witness found powder spot on rail—on the top of the rail; saw powder nowhere but on the top of the rail; powder spot commenced small on the edge next to the lane, and spread out as it extended; has known Pound some twenty-five or thirty years; saw Pound in a difficulty in 1865, when Pound appeared to urge a difficulty; this at school-house, with a Mr. Best; as far as witness has seen, Pound seemed to be a man that sought difficulties—always had the appearance of being a violent man; knew Harrison one or two years—seemed to be a very quiet, peaceable man, never knew of his having a difficulty with any one.

Next witness by the State—MR. E. H. RHODES: Is acquanted with Mr. Pound; Pound asked witness on Monday night, April Court, Hancock county, 1867, if witness had heard of his misfortune, and witness said he had; accused said he thought he had been imposed on by Mr. Carr in the neighborhood about the school; that he had helped build the house and Mr. Carr wouldn't let him send to school, and that he thought Mr. Harrison was put there to stand in Carr's shoes; nothing else was then said; witness and Pound then being at the fork of the road where they parted.

First witness introduced by defense—EMELINE GARNER:

Saw the killing of Harrison; witness is Pound's daughter; is now married; was not at the time of killing, and was then living with her father; witness first saw Harrison and John Carr in Carr's field, where negro was cutting logs; this place was between fifty and seventy-five yards from Pound's front door—about seventy-five witness thinks; a gun fired down the lane; the negro pointed towards the house; Pound fired the gun; witness was at that time standing in the door of Pound's house; was not with Pound, who was down below the orchard; distance from Pound's front door to place of killing about fifty yards; garden between the two places; the garden didn't reach to the lane; there was a few yards' space between the two; when gun fired second time Harrison and Carr started towards him firing in a run; witness started to where her father was; she went to tell him Carr and Harrison were coming, because, from the way they were coming, she thought they were going to murder him; all Pound's family, except one of witness' sisters, came out before the killing; her brother, Madison, was with her father when she reached him; doesn't know where her brother was before this; witness, when going towards her father, lost sight of Carr and Harrison; when she next saw them they were about seventy-five or one hundred yards in the field where the killing took place; Pound was near the little lane, fifty or sixty yards from the wood's end of the lane, Carr and Harrison being in Harrison's field, and Pound in his own; they came opposite Pound and stopped; the two parties, when Carr and Harrison stopped Pound, were about twenty-five yards apart; Pound then went in his field down towards the wood's end of the lane; had his gun then, and also when witness got to him; Carr and Harrison, also in Carr's field, went on down the lane; when Pound got near the end of the lane he stopped; Pound, then being still in his own field, turned back towards the hog, the hog being in the lane; Carr and Harrison turned back also; Pound then went on back in his own field towards the big road, until he got to the corner of the

garden; Carr and Harrison also went up the lane; when Pound reached the corner of his garden, he got over in the lane; Carr and Harrison had followed Pound about fifty yards or further along the lane to the corner of the garden; after Pound got in the lane, he went a few steps in the big road; don't know where the hog was then; Pound went round the plum nursery just before he got to the garden; plum nursery went close up to the lane; Carr and Harrison still went in Carr's field out near the big road; didn't go beyond the place where killing occurred; stopped at that place; Pound then went to the big road a few steps and turned back; witness did not see Carr and Harrison doing anything while at the place where killing occurred; Carr and Harrison were not putting up any fence at that place; Pound went back from the big road down the lane; he stopped at eight or ten steps down the lane from the big road; witness was then standing on a log near the mouth of the lane; witness got there by going through the yard; Madison was with Pound; her brother went through the yard with witness; when Pound went down the lane and stopped, he stepped upon the log; Mrs. Pound was in the lane, at the mouth; witness' little brother and sister were out at the scene; when Pound stepped on the log, he said something to Carr about killing his dog; he was then eight or ten steps from Carr, and was further from Harrison; Carr did not reply to the charge of killing the dog; Pound then told Carr he had been saying he was a coward and wouldn't fight, but if he didn't believe he would fight, to come over and try him; Carr then said something, witness didn't understand what, and Pound told him he could prove that Carr had said he was a coward and would not fight; Carr asked him by whom, and Pound said by good witnesses; Pound then said that John Harrison, a grand scamp, had been meddling himself about it; while this talk took place, Pound had gone farther down the lane; when Pound made the remark about Harrison, he was standing in the lane, about twelve or fifteen feet

from Harrison and Carr; then Harrison said, " I won't take that "—"you have done that that is unjust;" Harrison, when he said this, was at the corner of the fence, chopping on the fence with an axe; witness remembers stating this fact about chopping on the fence corner, to Judge Stephens at the place where the killing occurred; they were present then, with several others; this was between the first and second testifyings, witness thinks; Mr. A. H. Stephens, Benjamin Harris and Judge Linton Stephens were present; witness last testified in this case two years ago last May; testified next time before that in April, same year; this visit was between these two testifyings; witness does not remember whether she has at any previous time testified as to this chopping on the fence; witness came to state it at that time, by Judge Stephens asking witness where the parties were and what they were doing; after Harrison remarked, "I won't take that," Harrison started down the panel of the fence, towards Pound, who was at the other corner of the panel; then Pound said, " don't you come over here, if you do, I will 'kill' or ' shoot' you;" witness don't remember which of these words he used; Harrison then commenced getting on the fence, and after giving him this warning, Pound shot; Harrison had the axe in both hands as he started down the panel; Harrison put his left hand on the fence, still holding his axe in his right, and put his foot on the fence, some four or five rails up; the fence was twelve rails high; Harrison's hand was near the middle of the panel, and Harrison's head was over and above the fence, witness thinks—don't remember how high; then Pound fired; Pound was not exactly opposite Harrison when he fired—was a few feet further from the road; Harrison's right side was most turned toward Pound when Pound fired; Pound was four or five feet from Harrison when he fired; the muzzle of the gun was not far from Harrison when Pound fired—perhaps one or two feet from him; the fence behind Pound was as high as the one between him and Harrison; just back of the fence, behind where Pound was standing, was another

Pound *vs.* The State of Georgia.

fence, about as high as the lane fence; witness is not certain as to the height of this fence behind the lane fence; lane was not the same width all the way—at places, not more than five or six feet wide, if that wide; don't think a person could very conveniently ride horseback through the whole length of the lane; lane, where Pound shot, about ten feet wide; when gun fired, Carr was standing a few feet from Harrison, about a panel's length; when the gun fired, Harrison stepped off the fence and staggered backwards and fell; Carr then started towards home in a run; witness was still on the log; her brother, when gun fired, was standing by Pound; in passing up and down the lane, first words passed were those already stated by witness; witness saw Carr have a pistol, when Carr and Harrison stopped opposite Pound, Carr and Harrison in Carr's field, Pound in his; Carr seemed to be revolving the pistol in his hand; saw the pistol distinctly; saw it again when near the end of the lane towards the woods; the ground, where killing occurred, on the lane side and Harrison's field side, is level, witness thinks; didn't see what became of Carr; all went immediately to the house; didn't notice what became of the axe when Harrison fell; knows nothing of the loading of Pound's gun.

*Crossed by State:* When Carr and Harrison followed Pound's direction, they were in their own field, saying nothing to Pound; when Pound got over in the lane he went towards the big road, witness supposes to look for the hog; Pound had the gun when he got over the fence; didn't get it when he went up the road; the log on which witness was standing was about eight steps from the mouth of the lane; distance from log to the place of killing about twelve or fourteen steps; witness says she meant what she said, when she said she ran to tell Pound that Harrison and Carr were coming, because she feared they were going to murder him; doesn't remember whether she ever swore to this before; has been sworn three times before in this case, not oftener; witness says she did not swear on a previous trial that when Harrison started to-

wards Pound and uttered the words, " I wont take that," he was just opposite to where Pound was standing; is positive that she did not; don't recollect ever swearing before that when Harrison was shot he stepped backwards and fell; don't know that she ever did; the relative position of the parties at the time Pound made the remark about Harrison, and Harrison said he wouldn't take that, is as marked on the diagram by the witness. Carr stated off towards home; witness and Carr started about the same time—witness off towards her father's house with the family; witness didn't go to see Harrison; heard her mother say she went to see Harrison; thinks Pound pointed the gun upwards a little when he fired; from log on which witness stood to where Carr was when witness first saw pistol was about fifty yards; when she next saw pistol in Carr's hands he was about seventy-five yards from where killing took place, towards the wood's end of the lane; don't know what kind of pistol it was—was revolving the barrels round at this time; was about ten or twelve steps from Carr when she first saw the pistol; when seen second time was just across the lane; Carr is rather under common height, witness thinks; says positively she saw a pistol in Carr's hand; is as positive about this as anything she has testified to; don't know what became of the axe; it was not, so far as she knows, taken by any member of the family; her mother went to the scene after they had all got to the house; didn't swear on a former occasion that she saw her mother go to the fence where Harrison was killed one half or one hour later in the evening; don't remember to have sworn so; Pound, immediately after the killing, went in the yard and then started off to Sparta; don't remember whether he went in the house; Pound stepped back a little from the corner of the fence when he shot Harrison, which put him a little nearer the wood's end of the lane when he fired.

BY DEFENSE: In stepping back, Pound got a little farther from the road, towards the wood's end; when witness first saw

pistol, Carr was in his field; witness was in the lane; Pound in his field; second time saw pistol, Carr was in Carr's field; witness in her farther's field; when first saw pistol, Carr and Pound were about twenty-five yards apart; witness was about ten or twelve steps from Carr when she first saw pistol.

Next witness sworn by defense—JAMES M. POUND: Is the son of defendant; witness is eighteen years old now; was present when Harrison was killed by Pound; was with Pound when conversation began between Carr and Pound; Pound said something to Carr about killing his dog, and calling him a coward; witness doesn't remember what Carr replied; Pound said "and John Harrison, a grand scamp, has been meddling himself and telling wrong tales on me;" Harrison replied: "I wont take that; you have done that that is unjust;" when this was said Pound was at the corner of the fence where he was when he shot; supposes the muzzle of the gun was one and a half or two and one third feet from Harrison when Pound fired; Pound was near the middle of the lane when he fired; thinks he was little nearer fence where Harrison was than the other side of the lane; when gun fired Harrison staggered backwards and fell; don't know what became of axe; witness and all the family went off immediately together; thinks he told Carr after Harrison was shot to go off; told him that for fear Pound might shoot him; was in field plowing when his father motioned to him, and he went to where Pound was; Pound had before this, he supposes, shot at a hog; hog showed no signs of having been shot; witness saw the hog. All the family came out before the killing but one of witness' sisters; Harrison got his head right smart over the fence before shot; his feet were three or four, may be four or five rails, up the fence before shot, but witness did not notice particularly; Harrison was in the act of going along over the fence; didn't see Carr have a pistol; witness' next sister to himself, who was out there, is about four years younger, and his brother about seven years younger than himself. When you got to your father what

was the impression made on your mind as to the intention of Carr and Harrison, whether they were friendly or hostile? Did you see Carr and Harrison? Answer: I saw Carr and Harrison. Witness thought their intention was hostile.

*Cross-Examined:* Was fifteen years old when this happened; was fifteen the 11th January, 1867; was near Pound, in the field with him, when his sister went down the lane and got over the fence; didn't see Harrison and Carr all the while; saw Carr when he was down at the wood's end of the lane; saw no pistol in Carr's hand; is certain he saw Carr and Harrison down there; looked at them and knew them well; they said nothing to Pound; Harrison and Carr were in Harrison's field; Harrison had rented this field of Carr, witness heard; supposes Pound had been shooting hogs, don't know; witness was not present when Pound shot; was about two hundred yards off, plowing; came to his father because his father motioned to him to come; saw Pound from where he was plowing; saw Pound one time when he shot; after witness got to Pound, witness went on round through the yard to the road; witness went round through yard without any particular motive; witness went to where his father was, near mouth of lane, doing and saying nothing; Harrison and Carr were, at this time, in Carr's field, about fifteen or twenty yards down the lane; thinks they had about stopped; don't think they had exactly stopped—were moving slowly; Pound went back and met Harrison and Carr; Pound had his gun with him; didn't see Pound load his gun; knows nothing of his loading it; don't remember to have sworn once before that Harrison and Carr stopped before Pound got to them; if Harrison and Carr were saying anything, witness didn't hear them; Harrison, when shot, was leaning over the fence, inclining to the right, with the axe in his right hand, holding it out to his right side; holding it over the field side; the left side of his breast mostly to the fence; is certain axe was on field side, as his left side was mostly touching the fence; can't say why he went so near to where the killing

Pound *vs*. The State of Georgia.

occurred with his father, except he feared his father might be killed ; witness thought the intention of Harrison and Carr was hostile, from the way they were coming, following Pound up ; don't know whether Carr had stopped before Pound got to him ; knows he had stopped before Pound got to where Harrison was ; don't know whether Pound cocked his gun as he started down the lane ; told Carr to leave for fear Pound might shoot him ; this after Pound had shot Harrison ; Carr had no weapon, as witness saw ; witness was excited on that occasion ; could see, and did see, all the parties ; don't know what became of axe when Harrison fell ; didn't notice ; thinks he has previously sworn that he supposed axe fell back in the field where Harrison fell.

*Re-Direct :* Supposes now the axe fell back in the field.

BY THE STATE: About time witness left, Carr ran off ; when last seen, was about twenty, or twenty-five, or thirty yards off, running towards his father's ; may have sworn, on previous trial, that he was about forty yards off when last seen by witness.

Counsel for the defense offered the whole of what John Carr, witness in this case, swore to on a former trial, at October Term, 1867, of Hancock Superior Court, to show that what said Carr swore to on this trial is contradicted by what he swore to on said former trial. The Court rejected it because it is heresay evidence, and not sworn to in this Court, but said he would admit it if the whole is shown to conflict with any evidence, or if any part of it is shown to conflict, that part can be read. And the Court required it to be read first, to see whether the whole of it does conflict, before the Court would admit the whole of it.

Defendant proposed to introduce, in evidence, from the testimony of John Carr, delivered, under oath, at October Term, 1867, Hancock Superior Court, as, in Court, in writing, taken down, by authority of the Judge presiding at said trial, in 1867, and forming a part of the record from Hancock county in this case, the following sentence, which

was admitted and read : " Defendant told deceased if he came over the fence he would kill him, but deceased made no attempt to go over."

Counsel for defense offered, in evidence, the following testimony of John Carr, on the trial before the committing magistrate, which was admitted and read : " Then went to the field where negro was cutting logs; went to the field to see about some sheep; think Harrison went to see about the logs; thinks so because he carried his axe," to contradict what the witness, Carr, swore to on this trial as to what deceased said about taking his axe to the field to cut the logs, provided the negro could not get through himself that evening.  The whole of the evidence given before the committing magistrate, and on all other trials of this case, when Carr was sworn, was offered in evidence to show that witness never gave that version of it in any of them.   This evidence was rejected by the Court.

It is admitted by the State that Mrs. Garner, neither at the October Term, 1867, nor at the regular April Term, 1868, of Hancock Superior Court, in her testimony, made any mention of Harrison's standing at the fence corner, chopping the fence with his axe, just before the shooting; and it is further admitted by the State, that she did so testify at the May Term, 1868, of said Hancock Superior Court.

Evidence introduced by the State in rebuttal—JASPER McRAE, sworn : Knows John Carr; has known him some ten or twelve years; is acquainted with his character in the neighborhood in which he resides; bears a good character as an honest, truthful man; from witness' knowledge of his character, would believe him on oath, in a Court of justice; witness was at the school house day of killing, with John Carr; John Carr was asked for tobacco, and Carr said they wouldn't get it; then, in play, witness and Bowen Hitchcock searched Carr's pockets for tobacco, and found no pistol in any of them, or about his person, and if he had had a pistol they would have found it; after school, Harrison came down

to school house just before sundown, and witness went with Carr and Harrison to Harrison's house, and then left them.

By DEFENSE: Thinks they found tobacco about; knows some of his neighbors he wouldn't believe on their oaths; believes all he considers his friends would swear to the truth, until he knows they have sworn to a lie; thinks he don't make friends that would swear to a lie; is the son of James McRae, who has been sworn in the case; if Carr swore to two ways, witness would not believe then he swore to the truth.

Next witness sworn in rebuttal by State—BOWEN HITCH-COCK: Has heard the testimony of Jasper McRae on this trial, and confirms McRae's statement about searching Carr's person for tobacco. If there had been any pistol about Carr's person they would certainly have found it; they found no pistol about Carr; after school dismissed, John Harrison asked Carr to go home with him, and witness and Jasper McRae and Harrison and Carr went to Harrison's house; when McRae went on, witness remained at Harrison's house; was in the house with Harrison and Carr; after they took axe and went off, witness went home; saw Carr all the time in the house; house had only one room; if Carr took anything with him witness did not see it, and if he had taken a pistol, or anything of the kind, thinks he would have seen it; witness' brother-in-law, Harrison, had no pistol, kept none in his house; owned no pistol.

By DEFENSE: Witness is eighteen years old now; has been sworn every time this case has been tried; never was asked about the axe before; states that he did not testify on this trial to anything about the axe until Judge Hook asked him about it.

By STATE, in rebuttal: M. V. Frasier saw deceased and accused meet some time in October or November, 1866, at the Sunday school; his recollection is, it was on Sunday; Harrison spoke to Pound and Pound made no reply, as witness could see; Harrison said, " howdye do, Mr. Pound,"

and Pound made no reply; Harrison and Pound were near each other, and thinks Pound saw him and heard him speak to him; deceased was at that time living down at his father-in law's, Hitchcock; was not at that time living on Carr's land; lived then about two miles from where he was killed; is acquainted with John Carr's character in the community in which he lives; from his knowledge of his character, is compelled to say he would believe Carr on his oath.

BY DEFENSE: Witness doesn't think he told the accused that John Carr cheated him out of a pistol by telling him a lie; witness says that on that point his recollection don't serve him; don't remember that he said it exactly in those words, but knows he said he got the worst of the bargain.

MR. MORRIS recalled: Is acquainted with John Carr; never heard anything to the contrary of his being a man of truth and veracity; would, from his knowledge of Carr's character, believe him on oath as quick as he would any other man in the community of his age.

BY DEFENSE: Was acquainted with Carr's general character for truth and veracity; was in Hancock from 1863 to 1868; never heard anything against Carr's truth and veracity; since the trial of this case, has never heard John Carr's character for truth impugned, except in the Court-house; heard it said he contradicted himself, but never heard that he did it wilfully.

JAMES McRAE recalled by State: Is acquainted with John Carr's general character for truth and veracity in his neighborhood; from this knowledge, would believe him on oath as soon as any man of his age witness knows.

BY DEFENSE: Never heard anything against witness down there, either before or since Pound's trial; if he was to swear wilfully two ways, wouldn't believe either way he swore.

Counsel for the State offered in evidence the whole record of the testimony in this case, sent from the county of Hancock, which is admitted without objection.

Next witness in rebuttal by the State—MRS. S. M. DUG-GIN : Was at Mr. Carr's house the evening of the killing; was there when John Carr came in from where the killing took place; he told about the killing, and went to a desk and got a pistol, and buckled it on him, and then went for a doctor ; didn't see John Carr when he came in the yard ; doesn't know whether he brought an axe with him ; Mrs. Carr and witness then went as quickly as possible to the place of the deceased ; deceased was lying nearly parallel with the panel of the fence, with his feet about four feet from the fence, with his right hand thrown back, the other lying on his chest; saw no smoke on the rail, saw no axe on the ground; didn't examine the place very carefully ; didn't look for an axe; never thought of one; wife of deceased went a few steps before witness, and got to the body first; Mr. Morris came about five minute after witness reached the body.

Next witness by the State in rebuttal—MARY CARR : Witness was at her father's house the evening of the killing of Harrison ; saw John Carr after he came in the yard, before he reached the house; he called Mr. Morris and told him Pound had killed Harrison; this was between sunset and dark; didn't see John Carr when he first entered the yard ; saw him before he reached the house ; he had an axe; don't know what he did with the axe ; after John Carr entered the house he got a pistol from the desk and buckled it around him, and went immediately for the doctor ; the pistol belonged to witness' father.

Next witness in rebuttal by State—PRISCILLA CARR : Was leaning on the chair at her father's house, and saw John Carr coming up towards the house with an axe on his shoulder ; saw him before he reached the yard ; he called Mr. Morris and told him Pound had killed Harrison ; he then came in the house and got his father's pistol, and went off for the doctor.

Next witness introduced in rebuttal—GREEN B. CARR : The two ladies who have just testified are witness' daughters ;

John Carr is witness' son; John Carr owned no pistol at the time Harrison was killed; the pistol John Carr got from the desk was witness' pistol; witness had it on that day; when witness came back in evening he laid it in the desk; was at home when John got home from where Harrison was killed; first he heard of John Carr was John's calling Mr. Morris; Morris and witness got up and went out; if John Carr had owned a pistol witness thinks he would have known it; John Carr up to that time had never to witness knowledge owned a pistol.

Next witness in rebuttal by the State—GEORGE W. GARNER: Is acquainted with Pound, defendant in this case; witness was going through Carr's field one night, with two other boys; Pound halted them at the end of Carr's lane, where it entered the road; this not more than forty yards from Pound's house; Pound had a gun, and witness thinks the gun was cocked; Pound told them he liked to have shot them; he thought they were John Carr and John Harrison; witness says while coming through Carr's field that night when he was halted by Pound, he shot two or three times and hallooed once; saw Pound after Harrison was killed; one day, in coming from Sparta, in 1868, with Pound, and Pound was drinking, Pound told witness not to mind him— that he hadn't been in the habit of cursing until he killed Harrison, but that on that day he rolled out the oaths; in this conversation witness says, if he mistake not, Pound said his notion was, when he turned, to shoot them both; didn't specify any place as to where he turned back from.

BY DEFENSE: Don't know whether Pound is a drinking man; was drinking on the day this conversation occurred; this was, he thinks, in Spring of 1868—probably in February or March; never saw Pound drunk; he was drinking right smart that day; has seen him drinking right smart several times; don't know whether Pound is a sober man; has known him all witness' life; witness says he himself was not real sober when this conversation took place,

but was sober enough to know what he was doing; has been drunk several times in his life; William Garner was along that night, but he was good drunk; none of them were real sober; has never testified in this case before; was in a law-suit with Mr. Pound; witness was only trying to get the right for a negro he had hired; witness' nigger lost about all of it in the law-suit; never paid his addresses very much to one of Pound's daughters; flew around her right smart; says she did not refuse him; can show this by letters; Miss Pound threw up another girl to witness; Miss Pound did not refuse to marry witness; didn't want to marry her; Miss Pound got mad with witness, but he did not get mad with her; some say he got drunk and cursed her, but witness don't know whether he did or not; didn't mean to say he was so drunk he didn't know what he was doing; don't drink hardly any now; but the time has been that he got drunk whenever he got ready.

BY THE STATE: Was first subpœnaed in this case 17th March, 1870; don't know how he came to be subpœnaed; never named to Mr. Harrison, the prosecutor, or his counsel, any of these things until after he was summoned; has no idea how the knowledge he has just given the jury got to Mr. Harrison : witness never said anything about it to any one but Van Frazier, and never said much to him.

BY DEFENSE: Told Mr. Frazier about it, witness thinks, some time last winter; Frazier is a witness in this case.

MRS. DUGGIN recalled by the State: Mrs. Duggin was John Carr's teacher at the time of the killing of Harrison; is acquainted tolerably well with John Carr's character; boarded at his father's house ; taught him part of two years; when John Carr went to school he was a good boy, a sober boy, and one of veracity, and witness would believe on his oath in a Court of justice anything he would swear to; knows his character now in the community—would believe him on his oath without any hesitation.

BY DEFENSE: John Carr went to school to witness part

of 1866 and 1867 ; witness lives now in Dougherty county ; only lived there this year ; when witness spoke of John Carr's character she meant her own opinion of him and what she heard of him ; she has never heard his reputation for truth assailed. When asked if John Carr were to swear two ways about the same thing, would she believe him, she replied she don't think he could wilfully do this, but if he did she wouldn't believe both statements. When asked if he swore to an impossible thing would she believe him, answered she would not, but don't think he would swear to such a thing.

M. V. FRAZIER recalled by State: Heard portion of Garner's testimony just now; Garner was speaking to witness about the Pound case last January or February, 1870 ; Garner said nothing about having his statement repeated—they were just talking about the case; witness repeated Garner's statement in presence of Colonel Jordan and Green B. Carr; witness has been friendly with Pound—don't speak to him now ; has not for a short time ; is not friendly with him now.

BY THE STATE : Don't speak to Pound because he heard Pound had been meddling with some of his matters with freedmen, which witness thought caused him to be sued, and had been making some inquiries about his accounts in Sparta.

BY DEFENSE: Pound went to witness to secure a debt Pound had on some negroes ; dont remember that he told Pound he didn't owe the negroes, or wouldn't give five cents for Pound's debt on them ; when witness was sued by the negroes, judgment went against him for over $200 00; witness learned from his own counsel that the only interference of Pound had been to try to secure the debt the negroes were owing to Pound.

DR. GREEN recalled by the State: Witness is acquainted with John Carr's general character in his neighborhood ; from this character, and from witness' own knowledge of John Carr, he would believe him without hesitation, on his oath.

MR. MORRIS recalled by State: The powder spot on the top of the rail was straight across it—didn't come diagonally.

The diagram exhibited to the jury during the trial, was put in evidence by the State.

The evidence taken on the former trials is omitted, as not necessary for an understanding of the questions made in this Court. The evidence concluded, the Court charged the jury as follows :

"You, gentlemen of the jury, are judges of the law and the facts ; and from your intelligence you will be able to understand it by having it read to you, for the only difference between you and the lawyers is, that they read and study much, and know much, but men of your sense can understand a few sections in a short time as well as a lawyer.

" I will make a very brief charge. First, because you are made the judges of the law; and I have always thought the Court should not be compelled to give it in charge to men who are its judges. But the Supreme Court having adjudged otherwise, I comply with its ruling on the subject. And secondly, because but a few sections need be read to cover the points in issue. And because, also, they are so plain that they need but little if any comment. It is ' not contradicted but that the accused committed the homicide ' charged in the indictment, and that very much shortens the investigation.

" As the case has been argued on the ground that the offense was either murder or justifiable homicide, I will proceed to read to you a few sections of the Code that treats of the law on that subject. Here the Court read section 4264 of the Code, and said: To find the homicide justifiable under this section you must believe that when Pound killed Harrison he acted under the fears mentioned in section 4264, and not in a spirt of revenge. The important question with you is, by which motive was he influenced under all the circumstances of the case. The Court then read section 4266, and said: If you believe the facts bring

the case within this section, to justify the homicide you must believe the killing of Harrison was absolutely necessary to prevent an attack by him. A question is made whether this section applies to violence to the person. I am of opinion it does. And I am presented with the charge—or part of a charge—of Judge Reese on this section, and am requested to give it in charge as the law, which I do. Indeed, I agree with the whole of the charge, as I heard it read in the progress of the trial. But as I have been requested to charge particularly on the eleventh section of said charge, I will read it to you first. (Here the Court read part of Judge Reese's charge, for which see 7th section of the motion for a new trial. It is said that he did read it correctly.)

" ' So, if Pounds had said to Harrison, if he came over that fence he would kill him, and he had gone over, Pound might have been justified in killing him, if you believe such admonition amounted to persuasion, remonstrance, or a gentle measure; and provided, also, that such killing was absolutely necessary while Harrison was on the fence as described, and before he had gotten over. Such killing must, however, have been done under the conditions in the next section 4267.'

" While I agree with Judge Reese in all he said, I will go further and say what he might very properly have said, in addition to what I have read. For section 4267 applies to all murders, including any part that may be committed, contemplated in section 4266. Here the Court read section 4267 twice, and said that it read said section as appplicable to section 4266, in addition to, and as a part of Judge Reese's charge. " The above charge is applicable more particularly to facts proven by the defendant." If you believe Carr, the Court charges that the homicide set forth in the indictment is murder.

" Whether you will believe his version, is a question for the jury only. You have heard how he has been attacked, and supported, and defended, how corroborated, and how his

character was sustained by his neighbors, and how his statements were contradicted.

" Though the accused may have borne malice against the deceased, yet if, under the circumstances, the law would justify the killing, he should stand justified, notwithstanding the malice.

" We have already noticed what will be a justification, provided you believe the children of the accused.

" There need be no proof of express malice, if the homicide was committed when there was no considerable provocation, and where all the circumstances of the killing showed an abandoned and malignant heart.

" If Pound provoked Harrison to come over the fence with a view of killing him, he was not justified in the homicide, though Harrison was shot while on the fence, as described by defendant's witnesses.

" If a witness has made contradictory statements, one of which must be false, it is not *necessarily* perjury ; for there may have been an unintentional error ; the witness may have forgotten ; the proper questions may not have been asked ; there may have been error on the part of the Clerk ; or from confusion, or from timidity, he may have made the contradiction ; in such cases the jury may believe one statement or the other, or neither.   But if they believe the witness has corruptly perjured himself in any of the statements, he should not be believed in anything.   If, however, the jury believe none of the contradictory statements were corruptly made, and that the witness, except for them, should be believed, he may be credited in statements not contradicted.   *   *   *

" A witness who has committed perjury should not be believed in anything; one who has sworn falsely *unintentionally* is entitled to credit notwithstanding the falsehood."

"If the jury have a reasonable doubt of the guilt of the prisoner, on account of either the law or the facts, they should acquit.   What is a reasonable doubt the Court is unable to define; the Supreme Court attempted it and failed.   What might be

a reasonable doubt with the Court might not be so with the jury. The jury cannot weigh the evidence as in a civil case, but it must decidedly preponderate, beyond a reasonable doubt, on the part of the jury.

"Though the case has been argued on the ground that the homicide is either justifiable or murder, it is in the *power* of the jury to find it manslaughter; the jury may, therefore, if they wish, find either one of the four following verdicts: 1st. We, the jury, find the accused guilty of murder. 2d. We, the jury, find the accused guilty of voluntary manslaughter. 3d. We, the jury, find the accused guilty of involuntary manslaughter. 4th. We, the jury, find the accused not guilty.

" There having been several mis-trials in this case, and it having been well prepared and tried on this occassion, the Court expects a verdict, and expects to keep you confined until you render one."

The jury found the defendant guilty. His counsel moved for a new trial—

1st and 2d. Because the Court erred in admitting said evidence of James McRea, James Morrison and Van Frasier as to the character of defendant for violence, and deceased's character for peaceableness, and allowing them to give their opinions sometimes on particular facts and sometimes without them, and because defendant had not put his character in issue, and had no notice that it would be put in issue.

3d. Because the Court erred in overruling the objection of defendant and allowing the witness, John Carr, to state what was said to him by the deceased touching the purpose for which deceased carried the axe with him to the field, not in the presence of defendant, and before the difficulty had begun, and before the parties had got within sight of each other.

4th. Because the Court erred in rejecting the evidence offered by defendant that the whole testimony of the witness, John Carr, on all the former hearings of this case, as it appears

in the record from Hancock Superior Court, to contradict the testimony of the same witness on this trial, with a view of discrediting the witness, and in characterizing said former testimony as "hearsay" in the hearing of the jury, and in holding that only such parts of said former testimony could be admitted as should first be decided by the Court to be in conflict with the testimony of the same witness on the present trial.

5th. Because the Court erred in rejecting the said former testimony of John Carr, offered for the different, distinct purpose of showing that none of his former testimonies gave the version which the witness gave on the present trial, touching the sayings of deceased as to taking the axe for the purpose of cutting logs in case he should find that his help would enable the negro to finish the field that day.

6th. Because the Court erred in admitting, against the objection of defendant, testimony of the witness, Van Frasier, concerning the former violence and bad feeling of the accused towards deceased, as shown by the accused's refusal to speak to the deceased.

7th. Because the Court erred in charging the jury concerning section 4266 of Irwin's Revised Code, upon the subject of killing after persuasion, remonstrance, or other gentle means, and erred in the following particulars: 1. After charging, in the language of Judge Reese, that if the jury believed that the deceased was killed while crossing the fence with the intention of making a forcible attack upon the accused, and that a serious personal injury was intended, *i. e.,* might accrue to the accused, and such forcible attack and invasion, after warning and remonstrance not to cross the fence was given, could not be prevented except by shooting and killing deceased, then such killing was justifiable. The Court proceeded to add: So if Pound had said to Harrison if he came over the fence he would kill him, and he had gone over, Pound might have been justified in killing him, if you believe such admonition amounted to persuasion, re-

monstrance, or a gentle measure; and provided, also, that such killing was absolutely necessary while Harrison was on the fence as described, and before he had gotten over. 2. In adding still further: "Such killing must, however, have been done under the conditions in the next section, 4267," and adding still further in this immediate connection, " While I agree with Judge Reese in all he said, I will go further and say what he might very properly have said in addition to what I have read. For section 4267 applies to all murders, including any that may be committed, contemplated in 4266, and still further, in adding that the Court read section 4267 "as applicable to section 4266, in addition to and as a part of Judge Reese's charge, when, in point of fact, the application of section 4267 to cases included in section 4266 was not made at all by Judge Reese's charge, and formed no part of it, and had not received the weight of his judicial authority."

8th. Because the Court erred in charging the jury: "If you believe Carr, the Court charges that the homicide set forth in the indictment is murder;" and in adding: " whether you will believe his version is a question for the jury only; you have heard how he has been attacked and supported and defended, how corroborated, and how his character was sustained by his neighbors, and how his statements were contradicted."

9th. Because the Court erred in charging the jury: "There need be no proof of express malice if the homicide was committed when there was no considerable provocation, and where all the circumstances of the killing showed an abandoned and malignant heart," the error being founded on the want of evidence applicable to or in support of such a charge.

10th. Because the Court erred in charging the jury: "If a witness has made contradictory statements, one of which must be false, it is not *necessarily* perjury, for there may have been unintentional error; the witness may have forgotten, the proper question may not have been asked, there

Pound *vs.* The State of Georgia.

may have been error on the part of the Clerk, or from confusion or timidity he may have made the contradiction.

11th. Because the Court erred after charging, that if the jury had a reasonable doubt of the guilt of the prisoner on account of either the law or the facts, they should acquit, by adding: "what is a reasonable doubt the Court is unable to define; the Supreme Court attempted it and failed; what might be a reasonable doubt with the Court might not be so with the jury."

12th. Because the Court erred in charging the jury: "Though the case has been argued on the ground that the homicide is either justifiable or murder, it is in the power of the jury to find it manslaughter, and the jury may, therefore, if they wish, find either one of the four following verdicts: 1st. We, the jury, find the accused guilty of murder. 2d. We, the jury, find the accused guilty of voluntary manslaughter. 3d. We, the jury, find the accused guilty of involuntary manslaughter. 4th. We, the jury, find the accused not guilty.

13th. Because the Court erred in complimenting the witness, Morris, in the hearing of the jury, in the progress of the trial, and before the defendant had introduced any evidence, for having visited the place where the deceased fell so soon after the killing, and collecting the facts while they were fresh, for future use by the juries. The Court, in complimenting the witness, Morris, remarked that it did not intend to give any opinion as to his evidence.

14th. Because the jury, after the case had been given to them by the Court and they were deliberating thereon, did, without the knowledge of the Court, and without the consent or knowledge of the defendant or his counsel, obtain and have in their room, at the request of one or more of them, divers sheets of writing purporting to be records of the testimony given on this trial or former trials. And in support of this ground the defendant appended affidavits as follows:

STATE OF GEORGIA—WILKES COUNTY.—" In person David Pound came before me, and being duly sworn, deposeth and saith that he is informed and believes, that on the night of the 16th June, instant, during the deliberations of the jury which tried him for the offense of murder, that at the request of some member or members of the said jury to furnish them with the testimony which had been written down on the trial of said case, James M. Dyson, sheriff of said county, furnished said jury with divers sheets of paper purporting to be evidence given in at the trial or trials of said case, without the knowledge and consent of the Court, or of himself, or his counsel."

STATE OF GEORGIA—WILKES COUNTY.—"Before me, Judge of the Superior Court, in and for said county, personally comes James M. Dyson, who, on oath, says that the facts stated as to himself and the jury in the foregoing affidavit of David Pound are substantially true as stated therein, and this deponent further states that, in handing the papers to the jury, at their request, he had no idea of the impropriety or illegality of the act, and he supposes that the jury were equally uninformed as to the impropriety, and the thing was done without the knowledge of counsel on both sides."

The Court refused a new trial, and error is assigned on each of said grounds.

LINTON STEPHENS ; R. TOOMBS AND C. W. DuBOSE, for plaintiff in error. Error to admit evidence of defendant's general character: 3 Gr. Ev., secs. 25, 26 ; 4 Ball. N. P., 296; 14 Wend., 111; 5 Cax., 66, 284. Former fight inadmissible: 18 Ga. R., 460. Secondary inadmissible till primary evidence accounted for: 20 Ga. R., 156; 25th, 515. Error to pass judgment on evidence: 10 Ga. R., 511; 15th, 476. Error to give as part of Judge Reese's former charge what he did not charge. Section 4266 R. Code is not modi-

Pound *vs.* The State of Georgia.

fied by section 4267.    Error in leaving impression that deceased must have *gotten over* the fence before killing was justifiable.

J. M. MATTHEWS;   M. P. REESE, by Z. D. HARRISON, for the State.    Any evidence showing slayer's motive is admissible, if circumstances render it doubtful: 3 Stew. and P. R., 308, 315; 18 Ga. R., 222, 223.    Character illustrates motive: 1 Starkie's Ev., 56, 61, 66; 5 Ga. R., 137; 18th, 223; R. Code, sec. 3704.   *Res gestæ:* 5 Ga. R., 85.    Evidence taken down on former trial is secondary: 28 Ga. R., 19.    As to its admissibility: R. Code, sec. 3714.    The state of feeling between parties is proper to be shown: 5 Ga. R., 138; 18th, 225, 228.    Section 4266 is qualified by section 4267 R. Code: 18 Ga. R., 232; 39th, 718.    Hypothetical charge legal: 18 Ga. R., 230.    Malice implied: R. Code, sec. 4256.   If witness state a *falsehood* by mistake, he is not impeached, especially if corroborated as to his other evidence: 20 Ga. R., 156; 23d, 581.    The charge as to doubts was correct: 20 Ga. R., 167; 22d, 212; 6th, 276.    So as to form of verdict: 20 Ga. R., 156; and as to grades of homicide: 12 Ga. R., 142; 29th, 594; 18th, 235.    Court may compliment witness: 27 Ga. R., 288.   Jury may see evidence taken down on former trial: 25 Ga. R., 520; 26th, 156.    If verdict right, no new trial: 14 Ga. R., 65.

LOCHRANE, Chief Justice.

This case comes before us on a motion for a new trial upon fourteen grounds, most of which involve questions of practice and evidence important in their adjudication, and one ground involving matter of the gravest public interest in the construction of the law of homicide arising under the provisions of the Code.

We will briefly dispose of the various grounds of error in the order in which they are presented by the bill of exceptions.

Pound *vs.* The State of Georgia.

1. The first error assigned arises upon the admission of evidence by the State as to the defendant's character for violence and evidence of specific acts in regard thereto, as original evidence.   The general rule is, that the prisoner may give in evidence the character of the deceased for turbulence and violence.   The rule contemplates only the general character in this regard, and particular acts of violence are not admissible: 4 Parkins' N. Y., 558; 12 Rich. S. C., 430; 1 Met., Ky., 370.   This rule is founded on the plainest principles of justice; for the character of the deceased affords strong light in which to view the transactions.   In cases particularly of self-defense, that the deceased was a man of riotous and disorderly conduct, of overbearing and passionate disposition, easily excited to quarrels, and notoriously reckless of the feelings and rights of others, would constitute an essential element for the consideration of the jury, to ascertain whether the prisoner acted under the influence of self-preservation or was actuated by malice in the particular case.

But the Judge below enlarged this general rule by permitting the State to prove the general character of the accused for violence, and also particular acts.   The principle upon which we presume the Judge acted was deduced from the language used by this Court in 18th Georgia Reports, and in fact such was the argument of Mr. Harrison, the counsel who argued this case ably for the State.   That language is substantially, " that when the facts of the killing show *any doubt* as to whether the prisoner was actuated by the principle of self-preservation or malice, any testimony calculated to illustrate the motive to the jury would be proper."   We have examined this question in its application to cases of homicide, but do not concur in the construction that the rule applies equally as the right of both parties.   The prisoner may give in *any testimony* calculated to explain the motive under which he acted.   He is the party charged, and the law presumes malice, from the fact of the killing, against him; and, to remove this presumption, such

Pound *vs.* The State of Georgia.

evidence is admissible, when offered by him to explain the motives of his action.   But specific acts are not thus admissible except so connected with the homicide or growing out of the causes which led to it, or so cotemporaneous with its occurrence as to form a link in the chain of circumstances by which the case is bound together.   And if the character of the deceased for violence is put in issue by the evidence offered for the accused, then the right to rebut such evidence is invoked, as a matter of right; but only then, and not till then.   A new trial was granted when proof of the violent temper of the prisoner was introduced by the government where it had not been put in issue by him :   State *vs.* Merrill, 2 Der., 269.

. Intimately associated in law with this principle is the ground of the second exceptions, founded upon the admission of evidence by the Court of the character of the deceased for peaceableness.   We think it was inadmissible, and the Code, section 3704, does not change the general rule.

When the State of Georgia charges the commission of crime against the citizen, it is incumbent on the State to prove the accusation and to rebut, by proper testimony, matters permitted to be given in evidence for the defense, but not, in the first instance, to repel the presumption of the defense before these are put in issue by proof.   We, therefore, hold that the Court erred in its ruling upon this subject.

The third ground of error is in the Court admitting the testimony of the witness, Carr, relative to what the deceased said to him touching the purpose with which the deceased took his axe to the field.

In the view we take of this case, this ground of error is not material; but as a matter of evidence was it properly admitted ?   It may constitute a rule in other cases where its importance might weigh with significant influence on the verdicts of juries.   The proposition is whether declarations of the deceased of peaceful intent, antecedent to the difficulty, connected with his taking a weapon or instrument

with him, are admissible evidence for the State on trials for homicide. Nothing is more difficult than to lay down a general rule in cases of this character; the rules must, of necessity, bend with the weight of circumstances depending upon them. Accuracy of definition of what constitutes the *res gestæ* is impossible.

In *Munroe vs. State,* 5th Georgia Reports, 85, this Court has laid down the general rule as nearly and clearly as it can be reached by legal rules, and to which we may only add that, in matters involving the motives of parties, Courts should lean rather to admitting what may have even slight weight than in excluding light from the jury. Human action generally is inspired by some motive, which may lie on the surface and be suggested by the results, or may lie deeper and find its solution by some act or declaration preceding it; and what significance such acts or declarations bear to the main transactions rests in the judgment of the jury, whose duty it is to see its reasonableness of connection and importance, if it has any, in the influence of the conduct of the party, drawn from the whole and especially subsequent facts of the case.

2. The fourth error combines the principle of objection assigned in the fifth, and we will notice them together. It appears from the record in this case that a part of the evidence taken down on a former trial was offered in evidence for the purpose of showing the witness, Carr, had previously failed, on full examination, to give in evidence a material statement testified to in the then examination before the Court, and also to contradict the witness by the conflict in such previous and present examinations. The Court held that the evidence could not be admitted except such parts as the Judge presiding decided to be in conflict, and characterized such previous record evidence to be *hearsay.* It afterwards appears that the State put the whole in evidence without objection; but as a question of practice and principle we are called to adjudge the right to the admission of evidence as offered by the prisoner.

Pound *vs.* The State of Georgia.

We premise by saying, that evidence taken down by the Court on a previous trial, when properly proven, is not hearsay, but is entitled to the fullest consideration and weight as evidence; and it is the right of the defendant or State to offer it, under proper rule, to the jury, either in whole or in part; if the whole is offered, to show the negative of something stated, not testified to on a former trial by the witness, and the character of the admission whether previously the subject matter was inquired about, and what was said at that time—or if a part is offered, then to read such part to the jury, who will apply it by their memory of what was then sworn to, and the question of conflict or its materiality, or its motive and effect, is for the jury and not for the Judge, under our system of evidence and practice.   And, if upon the admission of such part or parts of the evidence as is thus given in, the State desires to offer the whole to explain or to rebut the parts previously given in by the prisoner, it is a right clearly recognized by the law for them to offer it, or *vice versa*, and read it to the jury, who must charge their minds with it and recollect it, as such testimony does not properly go out with the jury, but forms only a part of the general evidence in the case.

3. The sixth ground is predicated upon the admission of evidence concerning a particular fact of bad feeling between the prisoner and the deceased.   The fact proven was, that in October or November, 1866, the deceased spoke to the prisoner at the Sunday-school, and he did not answer him.   The killing took place in February, 1867.   Was this testimony admissible to show the *quo animo*, upon general principles?  For we do not care to limit these questions to any particular specialties arising out of this case.   In *Hatcher vs. The State*, 18th Georgia Reports, 460, when there was a previous fight and continuing threats down to the transaction for which the prosecution was instituted, this Court held that it was necessary to commence and to go back by the connecting evidence to such previous difficulty, and this upon the principle that

accruing provocation at the time ignores the effect of antecedent acts of provocation or threats.

In *Dufree vs. The State*, 33d Alabama, 380, proof of violence offered a servant of the prisoner, several weeks before the homicide, was not admitted. In *Newcomb vs. The State*, 37th Mississippi, 383, the mere fact that the deceased severely beat the prisoner, six weeks before the killing, was not admissible.

And cases might be multiplied to this effect, excluding evidence for the defense of particular acts of violence; the rule being that there must be some particular intent to kill in the previous quarrel, and this only for the purpose of showing malice, as threats or other intent are admissible for that purpose. But, under our rulings, we may say "that this Court stands pledged, by its past history, for the abolition, to the extent of its power, of all exclusionary rules which may serve directly or remotely, to reflect light upon the transaction upon which they are called on to pass:" *17th Georgia Reports*, 460.

In *Dillon vs. The People*, 8th Michigan, when the prisoner was absent eight or ten months preceding the homicide, evidence of the state of feeling between the prisoner and deceased was admitted. The Courts have not agreed upon the time dividing legal or illegal evidence, so far as its admissibility is permitted in relation to acts between the parties preceding the homicide, and no general rule can be distinctly traced over this disputed ground of judicial controversy. All we may assert, within the principles recognized, is, that there must be some link of association, something which draws together the preceding and subsequent acts, something which presents cause and effect in the transaction. If separate, distinct and independent, they ought to be excluded; for while every spark of light may be admitted, it must be struck out of the facts of the case, by bringing them together. As for illustration, if A and B had a previous difficulty, and A attempted to shoot B, and by interference, was prevented,

and the parties separated, and several months elapsed, and upon meeting A and B commence an attack, and either get killed, who was right or wrong in the previous difficulty is not material, and not to be considered by the jury; but the fact of the difficulty itself, showing the temper of the parties when they subsequently met, might lead the jury into a proper understanding of the acts of the relative parties and their conduct at that time. But the mere fact of not speaking, or slight personal difficulties, could only tend to embarrass the jury by introducing an element not connected with the case, and could only darken the counsels of the jury, if let in as an element for their consideration.

Between these two illustrations lies the dividing line dependent on the facts of the case, under the proper guidance and control of the Court, keeping in mind, as a cardinal rule, connection of causes with the final act, if particular acts are offered. As if A, jealous of his wife, finds B with her, and forbids him speaking to her, and afterwards meets B and her together, though weeks and even months have elapsed, the previous difficulty, though slight, would be proper evidence to go to the jury in case of homicide. But if A afterwards met B, and upon new cause of quarrel, distinctly separate from the first, the difficulty sprang up, the acts relative to the first ought to be excluded as not throwing light upon the homicide, and the fact of unfriendly feelings existing, is all which would be permitted.

4. The seventh ground of error is upon the charge of the Court. The Judge charged the 4266th section of the Code as applicable to this case, and qualified its application by the provisions in section 4267. In a word, the Court held that, "if, after persuasion, remonstrance, or other gentle measures used to prevent a forcible attack and invasion on the property or habitation of another, it could not be prevented, the party attacked might kill the person so forcibly attacking, if it appeared that the killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was

intended or might accrue to the person, property or family of the person killing (section 4266); and it must appear, in such case, that the danger was so urgent and pressing at the time of the killing, that in order to save his own life the killing of the other was absolutely necessary, and that the person killed was the assailant, or that the slayer had, really and in good faith, endeavored to decline any further struggle before the mortal blow was given ": Section 4267. The Judge added that this last section applied to all "*murders.*"

The substance of the charge further was that the Court held section 4266 to apply to cases of violence of the person, and therefore added, "If the prisoner had said to deceased, 'If he came over the fence he would kill him, and he had gone over, he might have been justified in killing him, if the jury believed the words uttered amounted to a persuasion, remonstrance or gentle measure, and provided such killing was absolutely necessary, while deceased was on the fence, as described, and before he had gotten over, and then stated such killing must have been done under the conditions in section 4267.'" He added, "Section 4267 applies to all murders, including any that may be committed, contemplated in section 4266." We may say at the outset of this question, that we differ with our brother below in his application of section 4266 to this case, under the facts, and in that section 4267 had any connection or application to section 4266, or a case where that section legitimately applied.

The facts of this case show Pound in a lane and deceased on the fence, in his own field, opposite. The evidence for defense claims that Pound stood a few yards from Carr, and deceased with his gun and Harrison with an axe. Pound said something to Carr about killing his dog. Carr did not reply. Pound then told Carr he had been saying he was a coward and would not fight, but if he believed he would not, come over the fence and try him. Carr said something not understood. Pound then said John Harrison, (deceased), a grand scamp, had been meddling himself about it. De-

Pound *vs.* The State of Georgia.

ceased then said, "I won't take that; you have done that that is unjust." When deceased said this, he was chopping with his axe on the fence. Then Pound said, "Don't you come over here, if you do I will kill or shoot you." Deceased commenced getting over the fence, and, after giving him this warning, Pound shot him.

This, in brief, presents the question whether this act was within section 4266 of the Code. We think not. That section applies to cases where remonstrance or gentle means ·fail to prevent a forcible attack on the habitation or property of another, and that it was absolutely necessary to prevent such attack and invasion or serious injury to the person, property or family, to kill the assailant. The whole section contemplates an attack upon the property or habitation of another, or to his person or his family, by an invasion of his rights of property, in the defense of which, after remonstrance, we may repel the force; for the attack must be forcible, and absolutely necessary, to justify taking life. The qualification of this section is apparent from its intent to justify the killing of one who forcibly invades the habitation or property of another, and who persists, after remonstrance with him, and qualifies section 4264, which gives permission to kill one who manifestly intends or endeavors, by violence or surprise, to commit a felony on either habitation, property or person. In the one case, as in burglary, robbery, or attempt to kill or maim, the law permits it without question, remonstrance, or other act. Such burglar, robber or felon, deserves death, and the law classes his killing with executions in advancement of public justice. If two or more tumultuously attempt to enter, the law permits instantaneous killing of such mob.

But the law puts to the act one *proviso* (section 4265) that bare fear of the acts alleged, will not bring the party within the rule.

Now section 4266 classes another line of defense after remonstrance. Such forcible attack may not comprehend fel-

ony, but serious injury; and the person mentioned in the section 4264, is again contemplated in section 4266 if his rights are forcibly attacked, and after remonstrance, the party persists in his forcible assault, and he cannot induce him to desist. The law does not contemplate his running away from him, and disgracing himself and family. When he is assaulted he has, in law, the right to stand against every assailant. He is not obliged to run ; he may warn off invasion ; he may say, " I will shoot you if you approach forcibly to invade my habitation, or injure my property, or deprive me of it, or if you design a serious injury to myself," defending the same, and if the party persists in such forcible attack and invasion. The difference between the two illustrations from 4264 and 4266, is that in the one you may kill on sight, in the other you must first use gentle means to prevent the assault and invasion ; but if the party keeps on forcibly to consummate his nefarious purpose, he forfeits his life to his assailant. And this law seems to be well founded in reason and justice. The peaceable and law-abiding are too often overrun by the rude violence of the reckless and unprincipled outlaw, and meet the outpourings of oaths and maledictions without resort to their natural and legal rights. If a man, peaceably walking the streets, is assailed by one threatening to cowhide him, and remonstrates with him, declining combat, is he bound, because a cowhide is not a weapon likely to produce death, and therefore the attack is not a surprise or a felony, to go into mutual combat to justify the killing under section 4267? And is life not more sacred than property, and may it not, in such case, be defended, after remonstrance, with equal privileges ?

5. We have heard this construction frequently given to the section 4266 ; and the use of the word person in the section has given some embarrassment in applying its provisions. Our opinion is, construing all the sections together, (and such is the proper mode of ariving at the correct conclusion,) that section 4266 applies only to the defense given

Pound *vs.* The State of Georgia.

to the citizen in protecting his habitation, or property, or family, or himself, while in such place, from forcible attack. The Code enlarges the class, for at common law the dwelling house only was within the privilege of such protection. Now, under the Code, the habitation, property, or family, are expressly within it. The section is, " if after persuasion, remonstrance, or other gentle measures used, a forcible attack and invasion on the property or habitation of another cannot be prevented, it shall be justifiable homicide to kill the person forcibly attacking and invading the property or habitation of another. But it must appear that such killing was absolutely necessary to prevent such attack and invasion, and that a serious injury was intended, or might accrue, to the person, property or family of the person killing." This applies to the right of defense growing out of an attack upon a man, or his property, or family, where they are at his home; the household gods, so to speak, are regarded with peculiar sanctity in the protection of the law. For life would be without object if home and family could be invaded and the father could not slay the invader. That right which Chatham boasted for the English citizen in his castle, has come down as an heritage of the common law, and is the same found in section 4266, enlarged in the language, though not changed in the effect.

And the illustration given, if a man meets another and attempts to cowhide him, the assailed stands in his rights of self-defense on a different principle of the law; for while an assault may not amount to felony, yet if accompanied with such great personal indignity as arouses the party to kill, such justification of the act comes within section 4268: "And all other instances which stand upon the same footing of reason and justice as those enumerated," etc. And the jury, under the facts in the particular case, would be the judges; and, as we have said, the character of the deceased for violence is admitted to show the motive explanatory of the act.

In the case at bar, whether there was or was not an attempt,

to cross the fence, the facts did not bring the case within the section 4266 of the Code. If A, peaceably, in the discharge of his business, is attacked by B, who forcibly attempts an invasion of his habitation or property, or serious injury to them or him, and A remonstrates with B " by soft words, turning away wrath," persuading him to desist, and A does not invite or provoke B, by mutual disposition, to quarrel or abuse of him, but stands under the shelter of the law, boldly, and B still follows up A, and, despising warning, rushes upon him, A may kill B, if in his defense of habitation, property or family. But if A commences the difficulty and pursues it, and, when B takes it up, gives him warning to desist or he will kill him, A has no right to fall back on the doctrine of remonstrance and persuasion, under section 4266.

We, therefore, say we differ with the Judge below in his application of section 4266 to this case, for the proof shows nowhere such remonstrance as carries the case within the rule. The case was one simply of Pound, being where he had a legal right to be, with bad feeling between him and Carr, protecting his property originally from 'interference by Carr's hogs. He had his gun with him, rightfully, on his plantation, to protect his premises. The deceased, a tenant of Carr's, with Carr's son, ran out to the scene, deceased carrying an axe at an untimely season, for it was late in the evening. Why go to where Pound was? Why follow him up and down the fence? Admitting they were on their own ground, their acts show that they were disposed not to shun any consequences that might arise. The two went together to the field. When they were coming, Pound's daughter goes to her father; his wife and son and little ones all gather around him. Why all this, if there was nothing in the approach, and the manner of the approach, to excite their apprehension? A man may be deceived as to danger, but his wife and little ones grouping about him shows more to my mind than an ordinary act of deceased and Carr. I do not take the mere *words* of witnesses, but acts. And, while in this position, as I be-

Pound *vs.* The State of Georgia.

lieve, both looking to a difficulty, Pound used language provocative of both Carr and Harrison.   Harrison seemed, from the evidence, disinclined to take it, said he would not.   And, if the physician's testimony is to be regarded, (and for myself, I must be permitted to express my very high appreciation of medical testimony; thousands of cases have depended on it for conviction, and I certainly give it full weight for the accused) as he said he would not take it, he was a very few feet from Pound, ascending the fence, axe in hand.   If the jury believed this, the mere question for the jury was, whether he intended to strike Pound with the axe.   It was for the jury to say whether he was going over the fence after saying " he would not take it," meaning the words used by Pound.   And if they so held, it seemed reasonable that he had the axe, inasmuch as Pound had his gun and gave warning he would shoot if he did come over.   And, therefore, the law applicable to this case, upon the facts, was not under section 4266, but under the principles of self-defense and the exceptions of reasonable fears in his mind, if deceased succeeded in the attack then made.   And we hold the Court erred in its charge, generally and specially, on the facts in this case.

6. The next ground of error is the charge of the Court: " If you believe Carr, the Court charges that the homicide set forth in the indictment is murder."   This charge was error.   The State had more witnesses than Carr.   Out of their testimony arose many questions of fact, and to single out any witness by name and give this charge, where there was more than him, was error.

7. Again, we say it was error in the Court to compliment any witness in the case.   Although the words used are not given, it appears, by the certificate of the Judge, that he complimented one of the witnesses for the State in the presence of the jury.   Such act was improper in the Judge.   The error, though unintentional, may have seriously affected and influenced the jury, and, as a practice, is liable to criticism, not commendation.

8. There is another ground of error in this case, which we do not regard as needing any comment, and must express some surprise at its reaching this Court, except upon the principle that frequently the Judges below overrule motions for new trial with the purpose of letting this Court hear the arguments and dispose of the case. The fact certified to is, that the sheriff handed the jury, while in their room finding their verdict, loose papers, purporting to be evidence. What effect these papers may have had on the verdict is immaterial; the act was illegal, and the verdict found by such jury was illegal, and the refusal to grant a new trial was error.

Judgment reversed.