### ROBERTS *vs.* THE STATE OF GEORGIA.

1. There was no error in administering the oath to twelve jurors at once, preliminary to their examination on their *voire dire* as to their competency. The practice rather commends itself to this court.

2. There was no error in postponing swearing the jurors in chief until a full panel of twelve was obtained.

3. An exception to the whole charge will not be sustained unless it be erroneous in its entirety. It was not error in the court to remind the jury of the importance of their duty both to society and the prisoner, for society has a deep interest in vindicating criminal

justice, and the life and liberty of the prisoner demand the gravest consideration.

4. If the interview which resulted in the homicide was sought by the defendant for the purpose of effecting a reconciliation with deceased, and he was driven to the necessity of killing him to save his own life, and he had not brought the necessity upon himself, he would be entitled to an acquittal. But if the object of the interview was to kill, or for mutual combat with deadly weapons, then his offense would be murder or voluntary manslaughter according as his conduct was marked by deliberation or excitement.

(*a*) No menace, threat, contemptuous gesture or presentation of weapons, without a manifest intention to use them presently, will justify the killing.

(*b*) Before the slayer can be justified, it must appear that he acted without malice, not in a spirit of revenge—that the deceased was the assailant—that in order to save his own life it was necessary to kill his adversary, or that he was under the pressure of other equivalent circumstances. He cannot avoid the fearful responsibility of guilt by the bare fear or apprehension of danger; the danger must be urgent and pressing at the time. He must decide the momentous question with reference to his accountability to the law, at the time, and by the exercise of the same mental and moral faculties which he employed to shoot.

Criminal law. Murder. Jury. Charge of Court. Practice in the Supreme Court. Before Judge SIMMONS. Bibb Superior Court. April Term, 1880.

This case is sufficiently reported in the opinion. The defendant was James Roberts, and the deceased, his cousin, Solomon Roberts.

HILL & HARRIS; BACON & RUTHERFORD; C. J. HARRIS; JNO. L. HARDEMAN, for plaintiff in error.

R. N. ELY, attorney-general; C. L. BARTLETT, solicitor-general: W. DESSAU; G. T. BARTLETT, for the state.

HAWKINS, Justice.

The defendant was placed upon trial for the crime of murder, in Bibb superior court, and convicted of volun-

tary manslaughter. After verdict of guilty of voluntary manslaughter, the defendant made a motion for a new trial, upon numerous grounds, amounting to twenty-seven in number, and we will proceed to consider the errors complained of in three respects: 1st, as to the formation of the jury: 2d, the charge of the court; and 3d, the finding of the jury.

1. It is insisted here that the court erred in having twelve jurors sworn at one time, well and truly to answer the questions touching their competency, and that this court in 60 *Ga., Williams vs. The State,* page 371, is illustrative of the point.

In that case the jurors were not put upon the prisoner singly, but by six at a time, after their competency was ascertained; but here the court, to save time, qualified twelve jurors at once; before the questions on the *voire dire* were asked, the simple oath that they would true answers make to such questions as would be put by the court or its authority, touching their competency, was taken, and when they were so sworn, then the court put each juror upon the prisoner separately, as was ruled proper in 60 *Ga.,* p. 371. We see no error on this point, but rather commend the practice. The prisoner can certainly suffer no harm in the administration of this preliminary oath.

2. So we can see no legal error in postponing until all the twelve are obtained, swearing them in chief, preparatory to submitting to them, as an organized jury, the trial of the prisoner. Under the old law, where the first two jurors constituted triors, there might have been a propriety in swearing those as they were accepted by the defendant but now that the court is the trior, we do not see why it is not as legal to swear the whole jury after their selection by both parties and all together; but still we think the old practice is better.

3. But the main question, and the one argued here with marked ability, concerns the charge of the court, and claims that the whole charge was erroneous, and also obnoxious to law, and many of its parts.

An exception to the whole charge will not be consid-ered by this court, unless it be erroneous in its entirety—and that disposes of that exception, except to say that we see no error on the part of the judge, or the presiding officer in the administration of criminal justice, to remind the jury of the importance of their duty, both to society and the prisoner; for society has a deep interest in vin-dicating criminal justice, and the life and liberty of the prisoner demand the gravest consideration.

4. The parts of the charges complained of and the re-fusals to charge may all be viewed and considered as affecting the law of self-defense, voluntary manslaughter and murder.

The defendant was convicted of voluntary manslaugh-ter, and the great question is, did the court submit the law controlling the issues fully to the jury so that they could say whether he was guilty of murder, either grade of manslaughter, or justified in the killing? It appears from the evidence that the prisoner and deceased were cousins, and on the day of the killing the deceased, his brother, and some others were standing on the side-walk on Third street, in front or near Conner's store and near the alley wherein he was killed. When prisoner and his brother came up prisoner had his hands in his pantaloons' pockets, and remarked to deceased, "Sol., I want to see you a minute." Deceased said "all right" and turned around and said to Jack, his brother, "hold my umbrella." The two walked off on the side-walk and crossing the al-ley, when about half-way, prisoner in front, some words were had, not precisely heard or understood by the wit-nesses, when defendant drew from the hip-pocket a self-cocking pistol, shooting the deceased in the head, killing him almost instantly. Many witnesses give evidence that the deceased had a pistol in his right hand when he was shot, by his side, and his left hand lifted either to grasp defendant or to prevent being shot. Two of the witnesses testify that deceased at the time of the shooting said,

"don't, don't." One witness, the brother of defendant, said that deceased drew his pistol as soon as he started to walk off with defendant at his invitation; also, that when defendant fired the fatal shot he stepped back several steps, drew and fired as quick as possible, quick as a flash of lightning.

The brother of defendant said, at the time of the shooting and just before, deceased drew his pistol, presented it, when defendant drew, fired and killed deceased. Evidence was also given by the brother of defendant that when the two got near the center of the alley defendant said, "Sol., I want to make friends with you if you did run me out of town," when deceased said, "G—d d—n you I will do it again," drawing his pistol, presenting it, reaching his left hand to and at prisoner, when prisoner shot to save his life.

Much evidence and many witnesses gave evidence concerning the transaction, and the defendant's statement claimed that his object in seeking the interview was to effect a reconciliation with deceased, whereas the state claimed that his intent was to take the life of deceased, as manifested by all the circumstances surrounding the homicide, and the matter here of serious inquiry is, did the court submit the issues of law fully to the jury upon these questions?

If it be true that the purpose of defendant was peace and reconciliation—and he was driven to the necessity of killing the deceased to save his own life, and by his conduct had not caused the necessity, then he would be entitled to be acquitted.

On the other hand, if he sought the interview either to kill or for mutual combat, with deadly weapons, then his crime would be murder, or voluntary manslaughter, according as his conduct was marked by deliberation, or excitement; but if the purpose of the defendant was to offer peace and the deceased rejected the overture, drew his pistol, presented it, and was killed by the pris-

oner to save his own life, not with malice or for revenge, and if the killing was absolutely necessary to save his own life, then, and then only, would he be entitled to a verdict of not guilty. No menace, threat, contemptuous gesture, or presentation of weapons without a manifest intent to use them presently, will justify the killing; the law is tender of human life, and shields it with all the safeguards mentioned in the Penal Code, and before the slayer can be justified, it must appear that he acted without malice— not in a spirit of revenge—that the deceased was the assailant—that in order to save his own life it was absolutely necessary to kill his adversary, or other equivalent circumstances, etc. He cannot avoid the fearful responsibility of guilt by bare fear or apprehension of danger; the danger must be urgent and pressing at the time.

He must ·decide the momentous question with reference to his accountability to the law at the time, and by the exercise of the same mental and moral faculties he employs to shoot, to strike or to kill.

According to one view of the testimony in this case, (that deceased had drawn his pistol when he started to walk to the alley with defendant—that defendant saw the weapon, and that it remained in that position during the parley and homicide, never raised or presented, and no effort to use it) prisoner was in as much danger at the first as he was at the last moment of the difficulty.

The mere show of a deadly weapon, without more, would not produce an exigency to justify homicide.

If he sought the interview with the deceased not to reconcile but to slay him, then his crime is murder; or if he sought it for a difficulty, or mutual combat, and with a deadly weapon, saying, "I want to see you a minute," and deceased replied "all right," and then a mutual intent to have a rencounter existed, and both, with weapons, fought, and he killed the deceased, then it could not be less than manslaughter, no matter who shot the first time, or whether the prisoner retreated or not, for as Sir Michael

Foster says, p. 295 : " This is holden to be manslaughter, for it was a sudden affray, and they fought upon equal terms, and in such combats upon sudden quarrels it mattereth not who gave the first blow."

No man under the protection of the law can be the avenger of his own wrongs. If they are of such a nature for which the law of society will give him an adequate remedy, thither he ought to resort; but be they of what nature soever, he ought to bear his lot with patience, and remember that " vengeance belongeth only to the Most High."

Now, according to the whole charge of the judge, the issues of murder, manslaughter and justifiable homicide were submitted to the jury. The charge on the whole contains a correct exposition of the law as applicable to the facts of the case, and we see no material error.

Nor do we think he erred in his charge concerning reasonable doubts, the jury having before them all the evidence ; and it appears to us that the motives of the defendant were not pacific, armed with that self-cocking pistol, so ready and powerful in fight, an ensign not of peace; with both hands in his pockets, on or near the deadly weapon, he sought the deceased, and within a minute or thirty sec_ onds, the tragedy was over—so quick, and the conversation so short and incoherent, that the nearest observer could not understand the whole of it, left the question of self-defense without sufficient evidence to support it.

We, therefore, affirm the judgment of the court refusing a new trial.