Doyal *vs.* The State of Georgia

| | |
|---|---|
| 70 | 134 |
| 90 | 312 |
| 70 | 134 |
| 101 | 16 |
| 70 | 134 |
| 103 | 204 |
| 70 | 134 |
| 107 | 687 |
| 109 | 506 |
| 70 | 134 |
| 117 | 706 |
| 70 | 134 |
| 118 | 3 |
| 118 | 889 |
| 70 | 134 |
| 125 | 141 |
| 70 | 134 |
| f127 | 356 |

## DOYAL *vs.* THE STATE OF GEORGIA.

[This case was brought forward from the last term under §4271 (a) of the Code.]

1. Where a city policeman was slain, and the mayor and council employed counsel to prosecute the slayer, this was not alone sufficient to disqualify all grand and traverse jurors residing within the corporate limits from sitting in the case, on the ground that they would be liable to taxation to satisfy the attorneys' fees. Such interest, if it exists at all, is too minute and remote to furnish a ground for challenge.

2. A person over sixty years of age is not a qualified juror; and if the court is apprised of the fact in time, it is his duty to excuse such person. Although one summoned as a juror, and who is over sixty years of age, may not have offered any excuse before the jury was impanelled, yet if, when his name was called in its order on the panel, he made known his age and desired to be excused, there was no error in so doing, although the defendant may have exhausted all his challenges but one in order to secure such person on the jury.

3. The provisions of the Code respecting the mode and terms of entering a *nolle prosequi* in criminal cases are directory and for the protection of the public; a departure from them furnishes no ground of defence to the defendant when arraigned under a subsequent indictment, except when a *nolle prosequi* has been entered without his consent after the case has been submitted to a jury. In that case, he has been once in jeopardy, and cannot be so placed again. But there is no such plea to an indictment as pendency of a former indictment or *autre fois arraign.*

(*a.*) The act of 1870 is improperly codified with §4649 of the Code of 1873.

4. Where one present at the scene of a homicide, in connection therewith, motioned toward the slayer with a stick, as if indicating flight, and the latter did flee, the person making the motion being in front of the slayer, who was in a situation to have seen him, evidence thereof was admissible.

5. A general character for violence cannot be established by proof of specific acts.

(*a.*) A defendant charged with murder can introduce proof that the deceased was a person of violent and turbulent character, only where it is shown *prima facie* that the prisoner had been assailed and was honestly seeking to defend himself.

(*b.*) The evidence being illegal, the court should not have allowed the defendant's counsel to state in the presence of the jury, for any purpose, what he expected to prove in relation to this matter.

Doyal *vs.* The State of Georgia.

6. When taken in connection with preceding explanations of the various grades of manslaughter and of self-defence, contained in the charge, the following charge was substantially correct: "If they found from the evidence that defendant and deceased met, and a rencontre ensued, in which defendant drew a deadly weapon and killed deceased, then whether the defendant was guilty of murder or manslaughter would depend upon their finding of the fact whether the killing was done with malice aforethought or not. If done with malice aforethought, it was murder, if not, it was manslaughter."

7. Nor, when taken in connection with other portions of the charge, was there any error in the following charge: "Before the defendant would be excused, under the law, for killing the deceased, it must appear from the evidence that at the time of the killing the danger was so urgent and pressing, the killing was absolutely necessary to save defendant's life."

8. That pending the selection of a jury in a criminal case, a portion of them already selected were placed in the court room with a bailiff, and an outsider came into the room, addressed one or two idle remarks to members of the jury, and on being informed of the impropriety of his presence, at once withdrew, will not necessitate a new trial, it appearing that nothing was said or done relevant to the case or which had any effect thereon.

9. That a bailiff slept in the room with the jury up to the time of the charge of the court, will not require a new trial, where it appeared that he neither conversed with them, nor they conversed among themselves in his presence or hearing about the case.

(a.) The affidavits show that the jury did not separate and were not out of the bailiff's presence during meal times, and that they saw no one else except the waiters who furnished their meals.

10. Where a defendant in a criminal case was aware of the presence of a witness during a conversation, and took no steps to secure his testimony at the trial, though he was accessible, a discovery after the trial of what such person would testify as to the conversation, is not newly discovered evidence such as will furnish a ground for new trial.

(a.) The other newly discovered evidence, if competent at all, would only be admissible to impeach a witness sworn on the trial; and such testimony furnishes no ground for a new trial.

11. The verdict is supported by the evidence.

March 13, 1883.

Criminal Law. Practice in Superior Court. Jury. Evidence. Before Judge STEWART. Spalding Superior Court. February Adjourned Term, 1882.

Alfred B. Doyal was indicted for the murder of M. A. Hancock. On the trial, the evidence for the state was, in brief, as follows:

Hancock was a policeman in the city of Griffin. Between him and Doyal hostile feelings had existed for some time before the homicide. A week before that occurrence, Hancock had arrested and imprisoned Doyal on the charge of being drunk on the streets. Doyal felt much aggrieved at his treatment, and after being released, complained thereof, and on several occasions threatened that he would kill Hancock. On April 23, 1881, Hancock was standing on the street. He was not at the time on duty as a policeman, nor did he have on his uniform, nor had he the usual weapons that he carried while on duty. Doyal stepped up to him and said that he was ready to settle " this matter. " Hancock responded, " Alf, that's all right. " Doyal had one hand in his pocket and was gesticulating with the other. He said, " God damn you, I will make it all right, " and fired upon Hancock. The latter placed his hands upon his bowels and said, " Alf, you have killed me. " The answer was, " God damn you, you can have it again, " and Doyal fired a second time. Hancock turned and went to a drug store near by, and as he entered he said to the druggist, " Doctor, I am shot. Pray for me. " He was laid upon the floor where he died in a few minutes. After firing the second shot, Doyal crossed the street waving his pistol and saying that he would kill the next man who came on, or making use of some similar expression. Some one said, " Alf, you had better run ; " and one Johnson, who was in the street in front of Doyal, motioned with a stick. Thereupon Doyal began to run, and a crowd began to pursue him. After running some distance he stopped, and when the sheriff came up, under order of the latter, he put down the pistol and surrendered himself. He stated that he had four shots yet left in his pistol, and he could kill a man with each one of them, but he did not want to kill anybody but his enemies. Some one

stated that Hancock was thought to be dead. Doyal said,, " I hope he is. If he is not, I would like to finish it;" also, that he had said he would kill Hancock before Saturday or Sunday night, and he thought he had done it; that he would be willing to hang if he could get another man; that he did not shoot to miss, but knew where he aimed; that he could be blindfolded and go in the dark and put his finger in the bullet hole where he intended to hit when he aimed and shot; that the second shot did not miss, but went either through Hancock's coat or his coat sleeve. No weapons were found on the person of the deceased. Before the homicide some one told Hancock of the threats which Doyal had made concerning him, and a fellow policeman advised him to be careful. He replied that he did not desire any advice, and that if Doyal fooled with him he would kill him. Shortly before the homicide, Doyal obtained from a bar-room near the scene of its occurrence a pistol which he had frequently borrowed before, and two or three minutes before the shooting, as he passed down the street, he was heard to use the words, " I will get him. "

The evidence on behalf of the defendant was, in brief,. as follows: Hancock was a dangerous man. When drinking he was violent and turbulent, but when sober was peaceable. His feelings towards Doyal had been for some time very hostile. A week previous to the shooting, he had locked Doyal in the calaboose, and three or four days before, upon Doyal's speaking to him, he had cursed and abused him, and stated that he would kill him if he (Doyal) spoke to him again. Just before the killing and near the scene thereof, Doyal had a conversation with one or two people. Just after he left, Hancock came down and asked what Doyal was talking about. The person addressed replied that it was about a well. Hancock responded, " You know well, he was talking about me. " While he was standing there, Doyal came out of a saloon, and started across the street. Hancock called him and

went towards him. He said that Doyal must take back something that he had said; that he (Hancock) was not then on duty, and it would be man and man. Doyal declined to retract, and started away, Hancock following and saying that it had to be settled. Doyal made some response, and then stopping told Hancock to let him alone. The latter insisted upon a retraction of what had been said, and Doyal declined. Hancock dropped his hand under his coat on or near his hip pocket. Doyal stepped back one or two paces and drew his pistol, Hancock advancing about the same distance. Doyal fired the first shot, and Hancock placed his hands upon his stomach. Doyal then fired the second shot and Hancock turned and went towards the drug store. Johnson, the person who the state's evidence indicated had motioned with a stick to Doyal, denied that he did so, but said that he was much excited and might have waved the stick in the air; that he had taken three drinks, but was not drunk. The city council of Griffin appropriated $200.00 to pay counsel fees in the prosecution of the case. Four days before the difficulty, Hancock had a pistol oiled at a shop. He stated that he was going to kill some damned rascal, and that the shopkeeper would hear what would happen pretty soon.

There was much other testimony in relation to the character of Hancock and tending to impeach witnesses, which is not material here.

The statement of defendant detailed the circumstances stated in the evidence on his behalf; denied making any threats; asserted the violent character of Hancock, and that insults and wrong had been done by him to defendant; that he obtained the pistol from the bar-room for a gentleman who wished to borrow it; that the difficulty happened substantially as stated in the evidence on his behalf; that Hancock was advancing with his hand upon his pocket when defendant fired, and that upon Hancock's ceasing to advance, defendant turned his pistol so as not to strike him with the second shot; that he was excited, and when the

crowd came towards him in the alley, he started off, but stopped and voluntarily surrendered himself.

The jury found the defendant guilty. He moved for a new trial on various grounds, all of which are sufficiently stated in the divisions of the decision where they are discussed, except the following :

(10), (11.) Because the court refused to allow defendant's counsel to prove specific acts of violence, cruelty or turbulence of deceased, in order to illustrate his character; and because the court, on objection of counsel for the state, refused to allow defendant's counsel to recite these acts in the presence of the jury.

(18.) Because Wyley Patrick, the father of the mayor of Griffin (who took an active part in the prosecution) went into the room where the jury were, and talked with one of the jurors apart from his fellows. [The affidavits produced on the hearing showed that on the first day the court adjourned before the jury was completed. The jurors who had been selected were left in the court room. Patrick came into the court room and inquired if court had adjourned. Receiving no answer, he sat down on a bench some thirty feet from the jury. He then went up to one of the jurors and asked, " How are our women getting on ?" He was then informed that he must leave the room, and did so, stating that he did not know that it was any harm to come in. He was intoxicated at the time. The verdict was in no way affected by his presence.]

(19), (20.) Because of newly discovered evidence. [The object of the newly discovered evidence was to impeach witnesses on the trial, and two of the newly discovered witnesses were desired to testify to a conversation between the defendant, themselves and another. Defendant knew that they were present, but did not know what their testimony would be until after the trial.]

(22.) Because the jury were allowed to separate after the case had been submitted to them. [It appeared from the affidavits introduced, that the jury were carried to a

v 70–10

saloon in the city to obtain their meals while the case was, in progress. The saloon was divided into stalls, which. were separated by plank partitions, but they did not reach to the ceiling, and the fronts of the stalls were open. The jury occupied two adjoining stalls, and a bailiff sat at a, part of them where he could see into both. The front door of the restaurant was closed, and no one was allowed to enter except the waiters, and they did not enter the stalls.]

The motion was overruled, and the defendant excepted..

JAMES S. BOYNTON, for plaintiff in error.

C. ANDERSON, attorney general; E. WOMACK, solicitor general; F. D. DISMUKE; J. J. HUNT; CHARLES R. JOHNSON, for the state.

HALL, Justice.

Alfred B. Doyal was tried for the offense of murder, at: the February adjourned term, 1882, of Spalding superior court, and found guilty; whereupon he made a motion for a new trial, upon the various grounds therein set. forth, which, after being heard and considered by the court. below, was overruled and denied. To this judgment refusing the new trial exceptions were taken, and by writ of error brought to this court..

1. The first grounds of this motion which we shall consider, are those which relate to the disqualification of certain grand jurors who belonged to the panel that found the bill of indictment against the defendant. The mayor and council of Griffin had employed counsel to assist in this prosecution, Hancock, the party slain, being one of the police force of the city at the time he was killed. Some of the members of the city council were on the grand jury that found the first bill. This bill, on motion of the solicitor general, was, by order the court, quashed, and an

order to that effect entered on the minutes. This order stated no ground upon which the indictment was quashed; a subsequent order, however, was taken, showing that it was quashed because certain named members of the city council who had employed counsel to prosecute, were of the panel of the grand jury that found ·the bill. Upon the panel that found the second bill, there were several jurors who resided in the corporate limits and who were tax-payers. Upon the trial, several residents of the city were put upon the prisoner as jurors, and they, as well as the last named grand jurors, were all challenged as improper jurors, because of their liability to taxation to satisfy the claims of the attorneys employed by the city council to prosecute; in short, because they were from this fact necessarily interested in the prosecution, and were not *omni exceptione majores.* This cause of challenge was overruled by the court, and we think correctly. The alleged interest of these jurors was so minute and so extremely remote as to be imperceptible and almost inconceivable. This objection because of interest must necessarily have some limits. It is not every degree of interest that will disqualify; and hence it is matter of determination on many occasions as to what degree of interest will be sufficient to exclude one from the jury. It is plain that there might be some degree of remote interest in the subject-matter that ought not to be considered as rendering a person incompetent. 11 *Ga.*, 207, 221; 29 *Ibid.*, 105; 5 Mass. R., 90; 7 Vt., 169. In this case, it was not shown that the jurors had been called upon, nor was it suggested that they ever would be called upon to pay tax to aid in this prosecution; or, if called upon, that they would voluntarily respond, or could be compelled to respond. Even in a case where persons associated themselves together to prosecute offenders against certain laws, and became responsible for the expenses, according to the amount of their subscriptions, they were held competent jurors, if they had not paid ·in their sub-

scriptions.    6 Gray, 343; cited Proffat on Jury Trial, §169.

2. When the jurors were called, and before they were empanelled and put upon the prisoner, the court inquired if any of them had excuses to offer why they should not serve.    There was one Kinard on the jury who offered no excuse at that time, but remained on the panel put upon the prisoner until his name was reached and called he then stated to the court that he was over sixty years of age and desired to be excused; whereupon the court, of its own motion, granted his request.    He was challenged by neither party, the state nor the prisoner. The prisoner alleges that he was an acceptable juror, and that he had exhausted all his challenges but one in order to reach him.    These facts he made known to the court, and protested against Kinard being excused; but notwithstanding this, the court held him incompetent to serve, and excused him.    To which ruling of the court the prisoner excepted.

That a person over sixty years of age is not a qualified juror is evident from the very words of the Code, §4681, par. 2 · and it has been held that it is the duty of the court, if apprised of the fact in time, to excuse him.    *Cochron vs. The State,* 20 *Ga.,* 752; *Buroughs vs. The State,* 33 *Ib.,* 403.

3. Upon being arraigned, the prisoner pleaded that there had been a former presentment in this case, in which a *nolle prosequi* had been entered at the instance of the solicitor general, and without his consent thereto, which he insisted relieved him from answering to the indictment or presentment on which he was then arraigned, and which had been found subsequently to that in which the *nolle prosequi* was entered.    This plea was demurred to, and the demurrer sustained, and error is assigned thereon.

It is urged in argument that, under section 4649 of the Code of 1882, it was not proper for the court to allow the solicitor general to enter this *nolle prosequi,* except for some fatal defect in the bill of indictment, to be judged of by the court, in which case the presiding judge should

order another bill of indictment to be forthwith submitted to the grand jury; or until an examination of the case had taken place in open court.

These provisions of the law are merely directory, and were intended to prevent an abuse of the power of entering a *nolle prosequi* by the solicitor general. They are improperly codified with what was section 4535 of the Code of 1863, and 4555 of the Code of 1868, which provided that no *nolle prosequi* should be entered after the case had been submitted to the jury, except by the consent of the defendant. This was evidently intended for the protection of parties accused of crime, and whenever their right to have a jury pass upon the case, after being submitted to them, has been violated, by causing a *nolle prosequi* to be entered without their consent, this court has invariably treated it as an acquittal. The cases to this effect are so numerous, and the principle they establish so plain, that it would be a waste of time and space to cite them. The solicitor general, by Irwin's Revision, §415, had authority, on the terms prescribed by law, to enter a *nolle prosequi* on indictment. What those terms were is sufficiently indicated in the subsequent clause of that section, as also by the succeeding section. They related, as it appears, wholly to the payment of the costs that had accrued; for if he had directly or indirectly exacted in money or other valuable thing from the defendant or anybody else, more than his lawful cost, then it became a subject-matter for investigation by the grand jury; and if that body presented him for having received more than his lawful costs, then he was disqualified from further discharging his official duties until a trial could be had upon a bill of indictment, and if that trial resulted in his conviction, he was to be fined and imprisoned at the discretion of the court. This conviction was made a ground of impeachment, and the disqualification consequent upon this action was made to continue until the adjournment of the next session of the general assembly.

Notwithstanding these stringent provisions, it seems that in the opinion of the general assembly the public was not sufficiently protected from this abuse of power by the solicitor general, and they accordingly passed an act approved October 28, 1870, and entitled "an act to repeal section 415 of Irwin's Revised Code, in relation to entering *nolle prosequis*," etc., by the first section of which it was enacted that no *nolle prosequi* should be allowed, except it be in open court, for some fatal defect in the bill of indictment to be judged of by the court, and if it was then allowed, the presiding judge should order another bill of indictment to be forthwith submitted to the grand jury." (Acts, 1870, p. 422.)

By some singular classification, this act was, by the codifiers of 1873, made a part of §4649 of the Code that year; but in 1877, the legislature passed another act upon this subject (Acts, p. 108), which, although it did not in express terms repeal the act of 1870, yet, as it seems to us, did so by necessary implication. This is entitled " an act to allow a *nolle prosequi* to be entered in criminal cases with the consent of the court"; and it enacts that "a *nolle prosequi* may be entered by the solicitor general in any criminal case, with the consent of the court, after an examination of the case in open court." This is the entire statute, except the usual repealing cause.

Notwithstanding this legislation, section 415 of Irwin's Revised Code appears in each subsequent edition of the Code precisely as it stands there. See Codes of 1873 and 1882, §380. How such distinct and dissimilar provisions as those which regulated the conduct of a court official, and such as were designed to protect the rights of persons accused of offences, could have been united in the same section of the Code, we do not understand. (See some timely and judicious observations upon this subject in the report of the Hon. Logan E. Bleckley, made in pursuance of an appointment by resolution of the general assembly,

approved December 11, 1882, to examine the Code of 1882, etc., pp. 8–10.)

We know of no instance in which a defendant in a criminal case has ever been allowed in this state to avail himself of a departure from the provisions of these acts respecting the entry of a *nolle prosequi* by the court or the solicitor general, as a defence to an indictment, except in the case of entering the *nolle prosequi* without his consent after the cause has been submitted to a jury. This latter, according to our Code, puts him in "legal jeopardy," and would avail him under that plea; but from the entry of a *nolle prosequi* under different circumstances, no such effect follows. In a case where a jury was empanelled and sworn, and the state's counsel had read the bill of indictment and made his opening remarks to the jury, but in which there was no arraignment and plea, the prisoner insisted that he could not be convicted on account of this omission, and was entitled to a verdict of acquittal, the court below allowed a *nolle prosequi* to be entered, and detained him until another indictment could be preferred and found; this court, upon writ of error, held that there was no error in the proceeding; that the prisoner was never in jeopardy. Harris, J., delivering the opinion, said: "We well know that, by the Code, a *nolle prosequi* cannot, without the consent of the accused, be entered on an indictment after a case has been submitted to a jury; but we decide that there can be no legal submission to a jury until after arraignment and plea, or issue made. Hence, we can perceive no error in the circuit judge in allowing the solicitor general to enter a *nolle prosequi* under the circumstances of this case. Had there been an issue as the law requires in all criminal cases, and one juror only empanelled and sworn, the case would then have been submitted, and no *nolle prosequi* could then be entered as of right, but only with the consent of the accused. Then the jeopardy of the accused begins, and not till then. Whenever a juror

has been selected and sworn, the cause must proceed to· verdict, unless one of those contingencies should occur provided for by statute." *Bryans vs. The State*, 34 *Ga.*, 323, 325.

That there is no such plea to an indictment as the pendency of a former indictment in the same case, or as *autrefois arraign*, we are well satisfied ; indeed, this was expressly so ruled in the case of The King *vs.* Swain & Jeffreys,. Foster's Crown Law, 104, 105, 106, citing 10 St. Tri. 36 ;. Cro. Car., 147 ; 3 Bur., 1468.

4. The error alleged to have been committed by the court as set forth in 6th, 7th, 8th and 17th grounds of the motion for a new trial, consists in allowing the testimony of certain witnesses, over defendant's objection properly made, to the effect that Johnson, who was standing near when the killing took place, motioned toward defendant with a stick ; in showing how the motion was made; that defendant was facing Johnson while he was making the motion, the witness not being able to state whether defendant saw the motion, and in remarking to counsel in the presence of the jury, in connection with this testimony : "You can prove anything that immediately followed, if connected with this transaction—anything said or done—anything stated to the defendant as part of the *res gestæ*."

Whether the facts testified, constitute any part of the transaction under investigation, it is not material to determine. The testimony was admissible, because the occurrence took place in the presence of the defendant, and he seems to have acted upon it. That he was in a situation to have seen what was done, and that it was done in connection with the killing, makes it competent. 65 *Ga.*, 147. Every fact or circumstance shedding light upon the transaction should go to the jury, and especially such facts. as show motive for the crime or the intent with which it was committed. 43 *Ga.*, 484. The act admitted here was in the presence of the defendant and directed immediately towards him, and in that it differs from the case cited from

53 *Ga.*, 640. Besides, there was doubt in this case as to the participation of the defendant in the crime and as to the motives for their presence at the scene of the combat. For similar reasons the case cited by the able and indefatigable counsel for the plaintiff in error from 56 *Ga.*, 274, is, unfortunately for his client, not more in point than that the statement of a witness to the disaster as to its cause, a short time after it occurred, made out of the presence of the defendant, was properly rejected. Besides, it was admissible as a warning to fly, and as part and parcel of the flight of the prisoner.

5. The 9th, 10th, 12th and 14th grounds of the motion for a new trial relate to the same subject, and may, therefore, be considered together. The defendant offered to prove by sundry witnesses specific acts of violence, turbulence and cruelty on the part of the deceased to his family and others, in order to show his desperate and dangerous character. He also offered to show his character for cruelty, and by a witness that, from what he knew of him, deceased was a turbulent and dangerous man. All this testimony, upon objection being made, was rejected by the court. It has been ruled that general character for violence, etc., cannot be established by proof of specific acts. *Keener vs. The State*, 18 *Ga.*, 194; *Pound vs. The State*, 43 *Ga.*, 128; Wharton's Cr. Ev., §68, and many cases cited in note 2.

The attorney general insists that " the true rule in such cases is, that the defendant can offer proof that deceased was a person of violent, turbulent and dangerous character only where it is shown, *prima facie*, that the prisoner had been assailed and was honestly seeking to defend himself "; and from a close and careful examination of the authorities, including the cases heretofore determined by this court, our conclusion is, that the limitation here contended for is neither unreasonable nor improper, but is in accord with the well-settled principles of the law in relation to self-defence. Dr. Wharton, in his able, accurate and

learned treatise upon criminal evidence, §§69 to 84 inclusive, shows that this limitation is adopted wherever such evidence is held admissible, in more than twenty states of this Union, including Georgia, and perhaps, likewise in England.   In section 69 of his work, he thus states the proposition : "The general principle, then, is this : not that it is lawful coolly to attack and kill a person of ferocious and bloodthirsty character; for it is as much murder in such manner to kill the most desperate of men as to kill the most inoffensive; but that, whenever it is shown that a person honestly and non-negligently believed himself attacked, it is admissible for him to put in evidence whatever could show the *bona fides* of his belief. * * * "He must first prove that he was attacked; and this ground being laid, it is legitimate for him to put in evidence whatever would show he had reason to believe such attack to be felonious."   Note 1 to this section cites a great number of cases sustaining the text.   This author, after reviewing the decisions of other states, says, (section 75): "In South Carolina, Georgia, Alabama, Kentucky, Tennessee and Mississippi, we have rulings to the same effect.   In these states, the practice is to admit evidence of the deceased's character for ferocity, in all cases in which the defendant is shown to have been acting in self-defence."   (See cases cited in note 1.)

In Bowles *vs*. The State, 58 Ala., 335, it was said that such evidence "is not receivable when there is nothing in the conduct of the deceased at the time of the killing which it illustrates."   In *Monroe vs. The State*, 5 *Ga.*, 137, Lumpkin, J., speaking for the court, says : "As a general rule, it is true that the slayer can derive no advantage from the character of the deceased for violence,  provided the killing took place under circumstances that showed that he did not believe himself in danger."   Again, in Keener's case, 18 *Ga.*, 223, the same enlightened and humane judge quotes with approbation, and adopts the decision of the supreme court of Alabama, in Queensberry *vs.* The State, 3 Stewart and Por-

ter, 308, in which it was said by Lipscombe, C. J., who delivered the opinion : "It is an acknowledged principle that if, at the time the deadly blow was inflicted, the person who inflicts has well-founded reasons to believe himself in imminent peril, without having by his fault produced the exigency, that such killing will not be murder." "If the killing took place under circumstances that could afford the slayer no reasonable grounds to believe himself in peril, he could derive no advantage from the general character of the deceased for turbulence and revenge." In Haynes' case, 17 *Ga.*, 484, Lumpkin, J., again says : "It has been well said and settled, however, that before the law of necessity can exist, a case of necessity must exist." In Hench's case, 25 *Ga.*, 701, McDonald, J., declared it the duty of the judge to enlighten the jury upon the law applicable to self-defence, and to impress upon them that it is not every danger to the slayer which justifies the killing of another; but that it is a danger to his life so great that, in order to save his own life at the time of the killing, the killing of the other was absolutely necessary."

And lastly, in Pound's case, 43 *Ga.*, 128, Lochrane, C. J., speaking for the court, laid down the rule that such testimony was "particularly applicable in cases of self-defence."

This evidence being illegal, the court should not have permitted the defendant's counsel to state for any purpose, in the presence of the jury, what he expected to prove as to it in relation to the matter. The course of the court, so far from being objectionable, as claimed in the 11th ground of the motion for a new trial, is rather to be commended. See *Hall vs. State*, 65 *Ga.*, 36.

6. The charge to the jury, when taken in connection with the explanations given them in the preceding part of it, the various grades of manslaughter and self-defence, that "if they found from the evidence that defendant and deceased met and a rencontre ensued in which defendant drew a deadly weapon and killed deceased, then whether defendant was guilty of murder or manslaughter would

depend upon their finding of the fact, whether the killing was done with malice aforethought or not. If done with malice aforethought, it was murder; if not, it was man-slaughter," was substantially correct and in accordance with the decision of this court in *Roberts vs. The State*, 65 *Ga.*, 430.

7. Nor, under the facts disclosed by this record, are we able to perceive any error in the charge excepted to, when taken in connection with other portions of the charge of the court as shown in the record, that " before the defend-ant would be excused, under the law, for killing the de-ceased, it must appear from the evidence that at the time of the killing the danger was so urgent and pressing that the killing was absolutely necessary to save defendant's life." This is almost the identical language used by this court in *Hinch vs. The State*, 25 *Ga.*, 699, and of the Code, §4333; especially is this true where defendant took no ex-ception to that portion of the charge which follows in im-mediate connection with the foregoing, viz: that it was also incumbent upon him to make it appear that the de-ceased was the assailant, or that he, defendant, had really and in good faith endeavored to decline any further strug-gle before the mortal blow was given. *Ib.*

8. There is nothing in the 18th ground of the motion for a new trial. Patrick's intrusion into the court room, where the portion of the jury that had then been selected were confined, was accidental and almost momentary. He remained only a sufficient length of time to address to some of the jury a few idle and irrelevant inquiries, which had no relation to the case, and none of which were noticed or responded to by any of the jurors. Upon being told by the bailiff that it was improper for him to be there, or to converse with the jury, he desisted and left imme-diately, although he was very drunk at the time. The ten jurors who had been selected testified by affidavit to these facts, and further swore that this intrusion had no

influence upon their finding. We are satisfied that no wrong was either intended or done to the defendant.

9. The grounds in the motion in relation to the bailiff's sleeping in the jury room at night and his intercouse with them or absence from them during their meals, are not sustained by the affidavits in the case. True he slept in the room with them every night during the trial, until after the final charge of the court they retired to deliberate thereon, but he did not converse with them, nor did they converse among themselves in his presence or hearing about the case; he refrained from any such conversation, and instructed them to do so. The testimony taken by affidavits conclusively shows that they were never separated from each other, nor were they out of his presence during meal times, and that they saw no one else except the waiters who furnished their meals. *Westmoreland vs. State*, 45 *Ga.*, 225; *Jones vs. State*, 68 *Ga.*, 760.

10. The remaining grounds which we shall notice specially, relate to alleged newly discovered evidence. Upon which we remark, that the portion thereof which related to the testimony of the witness, Doe, was not newly discovered, so far as the defendant was concerned. He knew it all the time; he was aware that his affiant was present at the conversation to which Doe had testified, but he had never heard the affiant's version of the conversation until the trial was over, and at the trial did not know what he would swear as to the same; but, although he knew this man was present, and although it seems he was accessible, he made no effort to procure his attendance as a witness at the trial.

The newly discovered evidence set forth in the affidavits of Leach and Blanton was of doubtful competency; if present, it could have contradicted the witness Gaddy only upon an immaterial point. But the evidence in both cases could have been received for the single purpose of impeaching the witness named, and a new trial is never

granted where the evidence discovered can be used only for that purpose. *Dobbs vs. The State*, 66 *Ga.*, 754.

11. The remaining grounds of the motion, that the verdict was contrary to evidence, decidedly and strongly against the weight of evidence, and without evidence to support it, and that it was contrary to law and the charge of the court, were not insisted upon here, and we regret to say that had they been urged, they would have been of no avail. A thorough and careful examination of the testimony satisfies us that the verdict was proper, and we are constrained to order the judgment affirmed.

Judgment affirmed.