## 30062. HEAD v. THE STATE.

Decided September 10, 1943.

*Marvin A. Allison, Alton G. Liles,* for plaintiff in error.
*Hope D. Stark, solicitor-general,* contra.

Gardner, J. The defendant was tried on an indictment for murder, and was convicted of voluntary manslaughter. His sentence was fixed by the jury at not less than three nor more than five years in the penitentiary. The deceased and the defendant, who were strangers to each other, met at a roadhouse. They were both very much under the influence of whisky. The defendant and several others assisted the deceased in a search for his switch-key. Failing to locate the key, the defendant adjusted the wires in order that the car could be driven without a switch-key. After this the defendant got into the car with the deceased, and they drove away. No one saw either of them again until after the homicide. As to what happened from then until the officers arrived at the home of the defendant and found the deceased lying five or six feet from the end of the porch of the defendant's house, there is only such information as came from the lips of the defendant. The officers found the body of the deceased. On his person was a gunshot wound which the undertaker described as having shot out the heart of the deceased. The defendant's version of the homicide appears in three separate statements freely and voluntarily made to three different persons on the night of the killing, and in his statement at the trial.

The undertaker testified: "He said he didn't want to kill nobody, but he said this man called him a son of a bitch, and he said, 'I went in the house and got my gun and shot him.'" The deputy sheriff testified: "He said they rode up that way and through that little road through there, and he left him at this junction of the roads out there, and the man drove down to his house and cussed him and was going to come in his house, and he got his gun and shot him. He said the man said he was going to spend the night with him." The sheriff testified: "I said, 'How come you to kill that man?' and he said, 'He called me a son of a bitch, and I shot him' at his [defendant's] home. He said he wanted to come in his [defendant's] house. He said he got in the car with him [deceased] down at Foster's place beyond Sweetwater, and said he drove on up the road, and he said there was a road up there the other side of Mr. Head's, and they drove out that road that comes into the Norcross road and tried to work on his car; said the car was running bad, and then they come on back over to the house, and said this man, said he got out there at the forks of the road and went on home and left this man there in the car, and said this man drove down into the little road that comes down into his house and stopped there at the veranda, and this man got out and was going to stay all night with him, and he told him he couldn't stay, and they got in an argument some way or other, and this man called him a son of a bitch, and he shot him. He said he went in the house and got the gun. . . Question: 'Did Mr. Head ever make any statement to you that this man was trying to attack him?' Answer: 'No sir, nothing more than he said he called him a son of a bitch, and he shot him.'"

The defendant, in giving an account of how he came to be in the car with the deceased, and as to how the killing occurred, made the following statement at the trial of the case: "I told him I was going that way too, I would go with brother; and he said, 'No, ride with me and see if it runs,' and I told him all right, and we give it a shove, and it skipped and wouldn't run good, but we went on up the highway, and I told him, 'Back over there behind my house.' The road turns off about seventy-five yards beyond my house, and there is a big hill over there; and I said, 'We'll get it over there on that hill and see if we can fix it; push it off.' And so we went on over on the hill, and I tore up my handkerchief and tied around

this wire that wasn't fastened, and fixed it, and we turned around and come on back, and the fellow never told me his name, and I didn't ask him, and we started on back going home and we got out there at that juncture, and I told him, 'I'll leave you here.' He got to wanting me to go with him, and I told him I couldn't go with him. I told him, I said, 'I live out here.' Well, he got mad because I wouldn't go with him, and I told him I couldn't, and he started cussing me, and I got out and walked on out to the house down the driveway, and he was out there just raising cain because I wouldn't go with him, and I walked off and left him to keep from having any trouble with him, and walked out to the house next to the porch. Well, in the place of him going down the highway like he was headed, well, he come back to my house, and there is a little bridge there, and he run his right wheel off that bridge, and I don't know what all he said, but any way he was mad and cussing; well, there was an automobile coming around the curve by the time he backed up in the road that I thought was going to hit him, and I didn't know what to do, and he holloed I was too damn good to go with him, and so I run in the house and got my shotgun. I didn't know what his intentions was, or what he was going to do, or nothing, and when I got back out there I told the fellow to get in his automobile and go ahead, and he said, 'I ain't going any-where.' He said, 'I'm coming in here.' I said, 'You are not.' He said, 'I am too, you God damn son of a bitch,' and when he did I shot him, and I didn't know what the man was going to do, and I thought I had a right to protect my home and my mother and two children. I thought I had a right to protect it."

■ The evidence, including the defendant's statement, warranted the verdict.

■ Two grounds of the motion for new trial assign error because the court, on objection, excluded testimony offered by the defendant, to the effect that the deceased had a reputation of having a violent and turbulent character when drinking. The court excluded this testimony on the ground that, before the defendant could introduce testimony as to the violent character of the deceased, there must first appear evidence that the deceased was the aggressor, and that the statement of the defendant alone that the deceased was the aggressor was not a sufficient basis in law for the introduction of such testimony. Able counsel for the defendant contend that since the

State introduced witnesses who testified as to the voluntary statements made by the defendant in which, while admitting the killing, he stated in connection therewith additional facts which showed that the deceased was the aggressor; and that since the State introduced the statement as to the admission of the killing, the defendant was entitled to the benefit of his entire statement. This he had. We do not think the statements of the defendant to the officers and to the undertaker show that the deceased was the aggressor. We are inclined to the view expressed by the judge in his order overruling the motion. He said: "Since in *Chapman* v. *State,* 155 *Ga.* 393 (117 S. E. 321), and in cases therein cited, it is held that the statement of the defendant to the jury alone is not sufficient to form the foundation for the admissibility of this testimony, it is difficult to see how his statements out of court would alone be any stronger. The fact that a witness testifies that he made such a statement out of court can not be more impressive than the statement by the defendant himself to the jury when they are seeing and hearing the defendant talk." See *Doyal* v. *State,* 70 *Ga.* 134. Hence, though it could be inferred from the statement of the accused made out of court that the deceased was the aggressor, such statement could not enure to his benefit in laying the foundation for the introduction of testimony by the defendant to establish the violent character of the deceased, more than his statement in his defense made during the progress of the trial. There are many decisions to the effect that the violent character of the deceased can not be put in evidence by the defendant, unless it shall first appear from the evidence, aside from the defendant's statement, that the deceased was the aggressor. The decisions in *Chapman* v. *State,* supra, and cit., are deemed sufficient without multiplying citations. The court did not err in overruling this ground.

■ Ground 3 assigns error because the court, over objections, permitted the solicitor-general to testify why the prosecutor, the brother of the deceased, and other members of the family of the deceased, were not present at the trial. The solicitor-general testified that he had promised the prosecutor to notify him when the case would be tried, but that he was unable to "contact" the prosecutor; and that the absence of the prosecutor was the fault of the solicitor-general in not notifying him. This testimony was objected to on the ground that it was immaterial, prejudicial, illustrated no

issue in the case, and was harmful to the defendant. Counsel has cited no authority to sustain his position. It is the general practice that in the absence of the prosecutor and material witnesses, the reasons therefor may be explained to the court and jury during the progress of the trial. It is not only the practice, but also right, and not of itself prejudicial to the defendant, that the court and jury should know why the prosecutor of a case is not present. We can not see how this could possibly have prejudiced the defendant's rights. The court did not err in overruling the motion for new trial.

*Judgment affirmed. Broyles, C. J., and MacIntyre, J., concur.*